**United States District Court**
**District of Columbia**

| | |
|---|---|
| **Republican Party of Louisiana**<br>    530 Lakeland Drive, Suite 215<br>    Baton Rouge, LA 70802<br><br>**Jefferson Parish Republican Parish Executive Committee**<br>    729 Champagne Drive<br>    Kenner, LA 70065<br><br>**Orleans Parish Republican Executive Committee**<br>    230 Carondelet Street<br>    New Orleans, LA 70130,            *Plaintiffs*<br><br>*v.*<br><br>**Federal Election Commission**<br>    999 E Street, NW<br>    Washington, DC 20463,            *Defendant* | Civil Case No. 15-cv-1241<br><br>THREE-JUDGE COURT REQUESTED |

## Verified Complaint for Declaratory and Injunctive Relief

Plaintiffs complain as follows:

## Introduction

**1.** Plaintiffs challenge provisions of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. 107-155, 116 Stat. 81 (Mar. 27, 2002), restricting "federal election activity," 52 U.S.C. 30101(20) (definition), as unconstitutional under the First Amendment (**I**) as applied to (**a**) non-individualized, independent communications exhorting registering/voting and (**b**) non-individualized, independent communications by Internet; (**II**) as applied to (**a**) non-individualized, independent communications and (**b**) such communications  from an independent-communications-only account ("ICA"); (**III**) as applied to all independent federal election activity; and (**IV**) facially.

**Verified Complaint**                           1

**2.** Because Plaintiffs "elect [BCRA's judicial-review] provisions to apply to this action,"

BCRA § 403(d)(2), "[i]t shall be the duty of the ... Court ... to advance on the docket and to expe-

dite to the greatest possible extent the disposition of this action ...," § 403(a)(4).

**3.** In relevant part, BCRA § 403, 116 Stat. at 113-14, provides as follows:

**SEC. 403. JUDICIAL REVIEW.**
(a) SPECIAL RULES FOR ACTIONS BROUGHT ON CONSTITUTIONAL GROUNDS.
—If any action is brought for declaratory or injunctive relief to challenge the constitutionality of
any provision of this Act or any amendment made by this Act, the following rules shall apply:

(1) The action shall be filed in the United States District Court for the District of Colum-
bia and shall be heard by a 3-judge court convened pursuant to section 2284 of title 28,
United States Code.

(2) A copy of the complaint shall be delivered promptly to the Clerk of the House of Rep-
resentatives and the Secretary of the Senate.

(3) A final decision in the action shall be reviewable only by appeal directly to the Su-
preme Court .... Such appeal shall be taken by the filing of a notice of appeal within 10 days,
and the filing of a jurisdictional statement within 30 days, of the entry of the final decision.

(4) It shall be the duty of the United States District Court for the District of Columbia and
the Supreme Court of the United States to advance on the docket and to expedite to the great-
est possible extent the disposition of the action and appeal....
(d) APPLICABILITY.— ....

(2) SUBSEQUENT ACTIONS.—With respect to any action initially filed after December
31, 2006, the provisions of subsection (a) shall not apply to any action described in such sec-
tion unless the person filing such action elects such provisions to apply to the action.

## Jurisdiction & Venue

**4.** This Court has jurisdiction under 28 U.S.C. 1331 and 2201-02 and BCRA § 403.

**5.** Venue is proper under 28 U.S.C. 1391(e) and BCRA § 403.

## Parties

**6.** Republican Party of Louisiana ("LAGOP") is a "recognized political party." La. Rev. Stat.

18:442. It is a "[s]tate committee," 52 U.S.C. 30101(15), and a "state party committee" (as a

"political committee"), 11 C.F.R. 100.5(d)(4).[1] Its purposes are: (1) electing Republicans to of-

---

[1] State or local committees (a.k.a. "party organizations," 11 C.F.R. 300.30(c)) are entities not
necessarily registered as political committee so as to be *party* committees.

fice and (2) supporting issues reflecting its principles. Bylaws art. I, § 3. LAGOP intends to do independent federal election activity without complying with challenged provisions as lawful.

**7.** Jefferson Parish Republican Parish Executive Committee ("JPGOP") is a "parish executive committee" controlled by elected members, not by the state political party, except the state party may establish member qualifications and prescribe officers, La. Rev. Stat. 18:444, and if a parish executive committee is not elected, the state central committee may convene qualified voters to elect one. *Id.* at 18:445. JPGOP is a "local committee," i.e., "part of the official party structure[] and ... responsible for the day-to-day operation of the political party at the [local] level." 11 C.F.R. 100.14(b). It is not a federal political committee, so not a "party committee." 11 C.F.R. 100.5(d)(4). It intends to engage in independent federal election activity without complying with the challenged provisions as lawful, but absent requested relief will not.

**8.** Orleans Parish Republican Executive Committee ("OPGOP") is also a parish executive committee and local committee that intends to do independent federal election activity without complying with challenged provisions as lawful, but absent requested relief will not.

**9.** FEC is the government agency with civil enforcement authority over BCRA and the Federal Election Campaign Act of 1971("FECA"), as amended, 52 U.S.C. 30101 et seq.

## Historical & Legal Context[2]

**10.** As explained in *McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003) (per curiam) (three-judge court), before BCRA state party committees could allocate certain costs:

> FEC permitted ... state party committees to solicit and accept donations outside of FECA's source and amount limitations ("nonfederal money") .... [P]olitical committees were permitted to establish ... federal accounts ... and ... nonfederal accounts[].... FEC[] ... permitted ... party

---

[2] This part collects provisions and background. *See* Tr. of Oral Arg. at 17, *McCutcheon v. FEC*, 134 S.Ct. 1434 (2014) (Scalia, J.: "[T]his campaign finance law is so intricate that I can't figure it out. It might have been nice to have the ... lower court tell me what the law is.").

committees to pay for the nonfederal portion of their administrative costs and voter registration and turnout programs with monies raised under relevant state laws ..., even if those state laws ... permitt[ed] contributions from corporate and labor union general treasury funds.

*Id.* at 196-7(footnotes omitted).[3] "[T]he allocation between the federal and nonfederal accounts for [administrative and generic voter drive expenses was] determined by the proportion of federal offices to all offices on a state's general election ballot." *Id.* (citing 11 C.F.R. 106.5(d) (1991)).

**11.** FEC allowed allocation of the following, *id.* at 198 n.13:

The Commission permitted, *inter alia*, the following expenses to be allocated: administrative expenses, which include rent, utilities, office supplies, and salaries, 11 C.F.R. § 106.5(a)(1)(i) (1991); the direct costs of a fundraising program or event, where federal and nonfederal funds are collected by one committee. 11 C.F.R. § 106.5(a)(2)(ii) (1991); and "generic voter drives," which included voter registration, and get-out-the-vote ("GOTV") drives where a specific candidate was not mentioned. 11 C.F.R. § 106.5(a)(2)(iv) (1991).

**12.** "[FEC's] rules ... mandated that ... national party committees disclose details of their nonfederal accounts, ... including donors' 'name, mailing address, occupation or type of business, and the date of [donation] receipt,'" but "[s]tate parties ... were exempt" and required only to report information on their federal accounts. *Id.* at 198 (citations omitted).

**13.** In Advisory Opinion ("AO") 1995-25 (RNC), FEC said non-express-advocacy "legislative advocacy media advertisements that focus on national legislative activity and promote the Republican Party should be considered in connection with both Federal and non-federal elections." *Id.* at 2. It said the cost of the issue ads could be allocated (as "administrative expenses" or "generic voter drive costs," depending on content) with up to 35% from nonfederal funds in presidential-election years and up to 40% from nonfederal funds in other years. *Id.*

**14.** Based on AO 1995-25, Republican and Democratic parties, at national and state levels, ran such issue ads (some mentioning candidates) "with a mix of federal and nonfederal funds as

_____

[3] *Federal funds* are defined at 11 C.F.R. 300.2(g); *nonfederal funds* are defined at 11 C.F.R. 300.2(k); *Levin funds* are explained at 11 C.F.R. 300.31 and .32(b)-(c), but are not involved here.

permitted by FEC allocation rules." *McConnell*, 251 F. Supp. 2d at 199-200.

**15.** In BCRA, Congress altered the foregoing practices by (**a**) defining "federal election activity" to sweep in voter mobilization, party promotion, and issue advocacy, *see* ¶¶ 16-27; (**b**) banning state and local committees from using any nonfederal funds for federal election activity (the "Ban"), *see* ¶¶ 32-33; (**c**) requiring federal funds for fundraising for federal election activity (the "Fundraising Restriction"), *see* ¶ 34; and (**d**) requiring reporting of federal election activity (the "Reporting Requirement"), *see* ¶ 35, so federal election activity may no longer be allocated between federal and nonfederal accounts under 11 C.F.R. 106.7(b).[4]

### A. Federal Election Activity Defined

**16.** BCRA § 101(b) defines "federal election activity" as follows (as codified):

(A) IN GENERAL.–The term "Federal election activity" means—
> (i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;
> (ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot);
> (iii) a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or
> (iv) services provided during any month by an employee of a State, district, or local committee of a political party who spends more that 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(B) EXCLUDED ACTIVITY.—The term "Federal election activity" does not include an amount expended or disbursed by a State, district, or local committee of a political party for—
> (i) a public communication that refers solely to a clearly identified candidate for State or local office, if the communication is not a Federal election activity described in subparagraph (A)(i) or (ii);
> (ii) a contribution to a candidate for State or local office, provided the contribution is not designated to pay for a Federal election activity described in subparagraph (A);
> (iii) the costs of a State, district, or local political convention; and

---

[4] Levin funds may be used for allocation but are restricted in fundraising and use. *See* 11 C.F.R. 300.31 and .33(c). Plaintiffs do not use them due to complexity, burdens, and restrictions.

(iv) the costs of grassroots campaign materials, including buttons, bumper stickers, and yard signs, that name or depict only a candidate for State or local office.

52 U.S.C. 30101(20). *See also* 11 C.F.R. 100.24 ("Federal election activity") (*infra* ¶ 27).

**17.** BCRA § 101(b) defines some of the foregoing terms as follows (as codified):

(21) GENERIC CAMPAIGN ACTIVITY.—The term "generic campaign activity' means a campaign activity that promotes a political party and does not promote a candidate or non-Federal candidate.

(22) PUBLIC COMMUNICATION.—The term "public communication" means a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising.

(23) MASS MAILING.—The term "mass mailing" means a mailing by United States mail or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period.

(24) TELEPHONE BANK.—The term "telephone bank" means more than 500 telephone calls of an identical or substantially similar nature within any 30-day period.

52 U.S.C. 30101(21)-(24). *See also* 11 C.F.R. 100.25-.28 (definitions) (*infra* ¶¶ 18-21).

**18.** "Generic campaign activity" requires a "public communication," 11 C.F.R. 100.25:

*Generic campaign activity* means a public communication that promotes or opposes a political party and does not promote or oppose a clearly identified Federal candidate or a non-Federal candidate.

**19.** "Public communication" excludes Internet communications, 11 C.F.R. 100.26:

*Public communication* means a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising. The term general public political advertising shall not include communications over the Internet, except for communications placed for a fee on another person's Web site.[5]

**20.** "Mass mailing" excludes "[e]mail or Internet communications," 11 C.F.R. 100.27:

*Mass mailing* means a mailing by United States mail or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period. A mass mailing does not include electronic mail or Internet communications. For purposes of this section, substantially similar includes communications that include substantially the same template or language, but vary in non-material respects such as communications customized by the recip-

---

[5] Because Plaintiffs do not intend such paid communications on another's website, they will, as here, use "Internet communications" with that possibility excluded.

ient's name, occupation, or geographic location.

**21.** "Telephone bank" excludes "[e]mail or Internet" phone service, 11 C.F.R. 100.28:

*Telephone bank* means more than 500 telephone calls of an identical or substantially similar nature within any 30-day period. A telephone bank does not include electronic mail or Internet communications transmitted over telephone lines. For purposes of this section, substantially similar includes communications that include substantially the same template or language, but vary in non-material respects such as communications customized by the recipient's name, occupation, or geographic location.

**22.** PASO (promoting, attacking, supporting, opposing federal candidates) communications

require a [non-Internet] "public communication," 11 C.F.R. 100.24(b)(3).

**23.** FEC defines "in connection with an election in which a candidate for Federal office appears on the ballot" (when "voter identification, get-out-the-vote activity, or generic campaign activity" are federal election activities) as follows, 11 C.F.R. 100.24(a)(1):

  (1) *In connection with an election in which a candidate for Federal office appears on the ballot* means:
  (i) The period of time beginning on the date of the earliest filing deadline for access to the primary election ballot for Federal candidates as determined by State law, or in those States that do not conduct primaries, on January 1 of each even-numbered year and ending on the date of the general election, up to and including the date of any general runoff.
  (ii) The period beginning on the date on which the date of a special election in which a candidate for Federal office appears on the ballot is set and ending on the date of the special election.

**24.** "Voter registration activity" *includes* Internet communications, 11 C.F.R. 100.24(a)(2):

  (2) *Voter registration activity.*
  (i) Voter registration activity means:
  (A) Encouraging or urging potential voters to register to vote, whether by mail (including direct mail), e-mail, in person, by telephone (including pre-recorded telephone calls, phone banks and messaging such as SMS and MMS), or by any other means;
  (B) Preparing and distributing information about registration and voting;
  (C) Distributing voter registration forms or instructions to potential voters;
  (D) Answering questions about how to complete or file a voter registration form, or assisting potential voters in completing or filing such forms;
  (E) Submitting or delivering a completed voter registration form on behalf of a potential voter;
  (F) Offering or arranging to transport, or actually transporting potential voters to a board of elections or county clerk's office for them to fill out voter registration forms; or

**Verified Complaint**                                    7

(G) Any other activity that assists potential voters to register to vote.

(ii) Activity is not voter registration activity solely because it includes a brief exhortation to register to vote, so long as the exhortation is incidental to a communication, activity, or event. Examples of brief exhortations incidental to a communication, activity, or event include:

(A) A mailer praises the public service record of mayoral candidate X and/ or discusses his campaign platform. The mailer concludes by reminding recipients, ''Don't forget to register to vote for X by October 1st.''

(B) A phone call for a State party fundraiser gives listeners information about the event, solicits donations, and concludes by reminding listeners, "Don't forget to register to vote."

**25.** "Get-out-the-vote activity" *includes* Internet communications, 11 C.F.R. 100.24(a)(3) :

(3) *Get-out-the-vote activity.*

(i) Get-out-the-vote activity means:

(A) Encouraging or urging potential voters to vote, whether by mail (including direct mail), e-mail, in person, by telephone (including pre-recorded telephone calls, phone banks and messaging such as SMS and MMS), or by any other means;

(B) Informing potential voters, whether by mail (including direct mail), e-mail, in person, by telephone (including pre-recorded telephone calls, phone banks and messaging such as SMS and MMS), or by any other means, about:

(1) Times when polling places are open;

(2) The location of particular polling places; or

(3) Early voting or voting by absentee ballot;

(C) Offering or arranging to transport, or actually transporting, potential voters to the polls; or

(D) Any other activity that assists potential voters to vote.

(ii) Activity is not get-out-the-vote activity solely because it includes a brief exhortation to vote, so long as the exhortation is incidental to a communication, activity, or event. Examples of brief exhortations incidental to a communication, activity, or event include:

(A) A mailer praises the public service record of mayoral candidate X and/or discusses his campaign platform. The mailer concludes by reminding recipients, ''Vote for X on November 4th.''

(B) A phone call for a State party fundraiser gives listeners information about the event, solicits donations, and concludes by reminding listeners, ''Don't forget to vote on November 4th.''

**26.** "Voter identification" would include Internet communications to "acquir[e] information

about potential voters," 11 C.F.R. 100.24(a)(4):

(4) *Voter identification* means acquiring information about potential voters, including, but not limited to, obtaining voter lists and creating or enhancing voter lists by verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates. The date a voter list is acquired shall govern whether a State, district, or local party committee has obtained a voter list within the meaning of this section.

**Verified Complaint**                                        8

**27.** FEC defines "federal election activity" thus, 11 C.F.R. 100.24(b):

(b) As used in part 300 of this chapter, *Federal election activity* means any of the activities described in paragraphs (b)(1) through (b)(4) of this section.

(1) Voter registration activity during the period that begins on the date that is 120 calendar days before the date that a regularly scheduled Federal election is held and ends on the date of the election. For purposes of voter registration activity, the term ''election'' does not include any special election.

(2) The following activities conducted in connection with an election in which one or more candidates for Federal office appears on the ballot (regardless of whether one or more candidates for State or local office also appears on the ballot):

(i) Voter identification.

(ii) Generic campaign activity, as defined in 11 CFR 100.25.

(iii) Get-out-the-vote activity.

(3) A public communication that refers to a clearly identified candidate for Federal office, regardless of whether a candidate for State or local election is also mentioned or identified, and that promotes or supports, or attacks or opposes any candidate for Federal office. This paragraph applies whether or not the communication expressly advocates a vote for or against a Federal candidate. (4) Services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

(c) *Exceptions. Federal election activity* does not include any amount expended or disbursed by a State, district, or local committee of a political party for any of the following activities:

(1) A public communications that refers solely to one or more clearly identified candidates for State or local office and that does not promote or support, or attack or oppose a clearly identified candidate for Federal office; provided, however, that such a public communication shall be considered a Federal election activity if it constitutes voter registration activity, generic campaign activity, get-out-the-vote activity, or voter identification.

(2) A contribution to a candidate for State or local office, provided the contribution is not designated to pay for voter registration activity, voter identification, generic campaign activity, get-out-the-vote activity, a public communication, or employee services as set forth in paragraphs (a)(1) through (4) of this section.

(3) The costs of a State, district, or local political convention, meeting or conference.

(4) The costs of grassroots campaign materials, including buttons, bumper stickers, handbills, brochures, posters, and yard signs, that name or depict only candidates for State or local office.

(5) Voter identification activity that is conducted solely in connection with a non-Federal election held on a date on which no Federal election is held, and which is not used in a subsequent election in which a Federal candidate appears on the ballot.

(6) Get-out-the-vote activity that is conducted solely in connection with a non-Federal election held on a date on which no Federal election is held, provided that any communications made as part of such activity refer exclusively to:

(i) Non-Federal candidates participating in the non-Federal election, if the non-Federal candidates are not also Federal candidates;

(ii) Ballot referenda or initiatives scheduled for the date of the non-Federal election; or

**Verified Complaint**                                    9

(iii) The date, polling hours, and locations of the non-Federal election.

(7) De minimis costs associated with the following:

(i) On the Web site of a party committee or an association of State or local candidates, posting a hyperlink to a state or local election board's web page containing information on voting or registering to vote;

(ii) On the Web site of a party committee or an association of State or local candidates, enabling visitors to download a voter registration form or absentee ballot application;

(iii) On the Web site of a party committee or an association of State or local candidates, posting information about voting dates and/or polling locations and hours of operation; or

(iv) Placing voter registration forms or absentee ballot applications obtained from the board of elections at the office of a party committee or an association of State or local candidates.

**28.** FEC publishes federal-election-activity periods for (**a**) voter-registration activity ("VR") (120 days before regular election, 52 U.S.C. 30101(20)(A)(i)) and (**b**) voter-identification ("VID"), generic-campaign activity" ("GCA"), and get-out-the-vote activity ("GOTV") (all three run from earliest primary filing date to the general election, 11 C.F.R. 100.24(a)(1)).

**29.** FEC provided 2012 Louisiana periods at www.fec.gov/info/charts_fea_dates_2012.shtmls thus: VID/GCA/GOTV = 12/09/11–11/06/12; VR = 11/25/11–03/24/[12] and 4/19/12–11/06/12.

**30.** FEC provided 2014 Louisiana periods at www.fec.gov/info/charts_fea_dates_2014.shtml thus: VID/GCA/GOTV = 08/22/14–12/06/14; VR = 04/24/14–12/06/14.

**31.** Louisiana federal-election-activity periods related to 2016 elections[6] follow: VID/GCA/GOTV = 12/02/15–11/08/16; VR = 11/06/15–03/05/16 and 07/11/2016–11/08/16.

### B. The Ban (on Using Nonfederal Funds for Federal Election Activity)

**32.** The *Ban*, BCRA § 101(a) (adding FECA § 323(b)), prohibits "state, district, or local committees" from using nonfederal funds for federal election activity, 52 U.S.C. 30125(b)(1):

**(b) State, district, and local committees**
**(1) In general**
Except as provided in paragraph (2) ["Levin funds"], an amount that is expended or disbursed for Federal election activity by a State, district, or local committee of a political party

---

[6] *See* www.sos.la.gov/electionsandvoting/publisheddocuments/electionscalendar2016.pdf ("Presidential Preference Primary" election = 3/5/2016 with "[q]ualifying period begin[ning] 12/2/2015"; "Open Primary/Presidential/Congressional" election 11/8/2016).

(including an entity that is directly or indirectly established, financed, maintained, or controlled by a State, district, or local committee of a political party and an officer or agent acting on behalf of such committee or entity), or by an association or similar group of candidates for State or local office or of individuals holding State or local office, shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

**33.** FEC summarizes those "limitations" and "prohibitions" thus, *Local Party Activity* at 3,:

Prohibited contributions include:[2]
- Contributions from National banks and corporations (any type);
- Contributions from labor organizations;
- Contributions from federal government contractors;
- Contributions from foreign nationals; and
- Contributions made by one person in the name of another.
  11 CFR 114.2, 115.2(a), 110.20(c) and 110.4(b)....

In addition ..., contributions received by a local party organization for use in federal election campaigns are subject to the following calendar year limits:
- $10,000 from any individual or unincorporated group;[3]
- $100 in cash from any contributor; and
- $50 from any anonymous contributor.
  11 CFR 110.1(c)(5) and 110.4(c)(1), (2) and (3).

---

[2] In addition, local party organizations may not accept funds from ... the following ... for use in state or local ... election activity: National banks, federally chartered corporations and foreign nationals. 11 CFR 114.2(a). Note that contributions can be made from separate segregated funds ... established by corporations or labor organizations.

[3] Bear in mind, however, that a party organization triggers a registration and reporting requirement when it raises more than $5,000 during a calendar year for the purpose of influencing federal elections.

### C. The Fundraising Requirement (Requiring Federal Funds for Fundraising)

**34.** The *Fundraising Requirement*, BCRA § 101(a) (adding FECA § 323(c)), requires state

and local committees to pay "direct costs," 11 C.F.R. 300.32(a)(3), of fundraising activity as fol-

lows, 52 U.S.C. 30125(c):

An amount spent ... to raise funds that are used, in whole or in part, for expenditures and disbursements for a Federal election activity shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act.

### D. The Reporting Requirement (Requiring Monthly Reporting)

**35.** The *Reporting Requirement*, BCRA § 103(a) (adding FECA § 304(e)), requires *monthly*

reporting by "political committees"[7] of federal election activity, including identifying information

on disbursements/receipts for "person[s] aggregating in excess of $200 for any calendar year," 52

U.S.C. 30104(e):

> **(2) Other political committees to which section 30125 of this title applies**
> **(A) In general**
> In addition to any other reporting requirements applicable under this Act, a political committee (not described in paragraph (1) [national committees]) to which section 30125 (b)(1) of this title applies shall report all receipts and disbursements made for activities described in section 30101(20)(A) of this title [federal election activity], unless the aggregate amount of such receipts and disbursements during the calendar year is less than $5,000.
> **(B) Specific disclosure by State and local parties of certain non-Federal amounts permitted to be spent on Federal election activity**
> Each report by a political committee under subparagraph (A) of receipts and disbursements made for activities described in section 30101(20)(A) of this title shall include a disclosure of all receipts and disbursements described in section 30125(b)(2)(A) and (B) of this title.
> **(3) Itemization**
> If a political committee has receipts or disbursements to which this subsection applies from or to any person aggregating in excess of $200 for any calendar year, the political committee shall separately itemize its reporting for such person in the same manner as required in paragraphs (3)(A), (5), and (6) of subsection (b).
> **(4) Reporting periods**
> Reports required to be filed under this subsection shall be filed for the same time periods [monthly] required for political committees under subsection (a)(4)(B).

### E. The Federal-Account Requirement for Federal Election Activity

**36.** "All disbursements ... by any State ... or local party organization or committee in connec-

tion with a Federal election must be made from ... a Federal account [except for a Levin account,

not applicable here] ... or ... [a] separate allocation account [not at issue here absent Levin funds

and the ability to allocate any federal-election-activity disbursements to nonfederal funds]." 11

C.F.R. 300.30(b)(3)(iii). "In connection with a Federal election" "includ[es] payments for Fed-

eral election activities." *Id.* at 300.30(b)(3)(iv). So Plaintiffs must pay for any federal election

---

[7] All federal election activity must be funded from a federal account registered and reporting as a "political committee." *See* ¶¶ 36-39.

activity they might do from a federal account.[8]

**37.** "Each State ... and local party organization or committee that has receipts or makes disbursements for Federal election activity must establish its accounts in accordance with (c)(1), or (c)(2), or (c)(3) ...." 11 C.F.R. 300.30(c). The cited options each require a federal account,

> which must be in a campaign depository ... which must be treated as a separate political committee and be required to comply with the requirements of the Act including the registration and reporting requirements of 11 CFR part 102 and part 104. State ... and local party organizations or committees may choose to make non-Federal disbursements, subject to State law, and disbursements for Federal election activity from a Federal account provided that such disbursements are reported pursuant to 11 CFR 104.17 and 11 CFR 300.36, and provided that contributors of the Federal funds so used were notified that their contributions were subject to the limitations and prohibitions of the Act.

11 C.F.R. 300.30(c)(1). (This provision allows as optional accounts a nonfederal account (but nonfederal funds unuseable for federal election activity) and a Levin account (not at issue here).)

**38.** So even if a local committee is not compelled to be a political committee (based on triggers at 11 C.F.R. 100.5(c)), it must establish a federal account treated and reporting (monthly) as a federal political committee in order to "ha[ve] receipts or make[] disbursements for Federal election activity." 11 C.F.R. 300.30(c).

**39.** And local committees wanting to send a single email in a federal-election-activity period merely exhorting registration or voting, 11 C.F.R. 100.24(a)(2)(i)(A) and (3)(i)(A), must first establish a federal fund to pay costs attributable to the email.[9] The federal-election-activity definition has a de-minimis exception not enumerating emails. 11 C.F.R. 100.24(c)(7). "[C]osts asso-

---

[8] Local committees that are not political committees but "make[] *contributions*, *expenditures*, and *exempted payments*" may "demonstrate through a reasonable accounting method" that they have sufficient federal funds to do so. 11 C.F.R. 102.5(b)(1) (emphasis added). But no such option applies to the *federal election activity* Plaintiffs intend. (The reasonable-accounting-method approach does apply to *Levin funds*, *id.* at 102.5(b)(2), inapplicable here.)

[9] Despite the low cost of an email or website posting, the attributable costs to be paid for with federal funds might sweep in, e.g., website, computer, and Internet access costs due to a "ripple effect." *See* ¶ 62 (space/time allocation inappropriate).

**Verified Complaint**                                       13

ciated with activities not enumerated, regardless of how small, must ... be paid with Federal funds ...." FEC, "Definition of Federal Election Activity," 75 Fed. Reg. 55257, 55265-66 (Sep. 10, 2010) ("2010 E&J"). FEC expressly rejected the recommendation to exempt Internet communications from the voter-registration and get-out-the-vote definitions. *Id.* at 55261 and 55263.

### F. Political Committee Status

**40.** A *state committee* of a political party becomes a political committee if it meets the trigger amounts set by 52 U.S.C. 30101(4)(A) (*see also* 11 C.F.R. 100.5(a)):

> (4) The term "political committee" means—
> (A) any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year ...."

**41.** A *local committee* of a political party becomes a political committee if it meets the trigger amounts set by 52 U.S.C. 30101(4)(C) (*see also* 11 C.F.R. 100.5(c)):

> (4) The term "political committee" means— ...
> (C) any local committee of a political party which receives contributions aggregating in excess of $5,000 during a calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

**42.** These "payments exempted from the definition of contribution or expenditure" but triggering political-committee status for local committees, include (**a**) slate-cards (not distributed by "general public political advertising"), (**b**) volunteer-distributed bumper stickers and posters, and (**c**) limited presidential-voter-mobilization efforts, 52 U.S.C. 30101(8)(B)(v), (ix), and (xi):

> (v) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply to any cost incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines, or similar types of general public political advertising; ...

(ix) the payment by a State or local committee of a political party of the costs of campaign materials (such as pins, bumper stickers, handbills, brochures, posters, party tabloids, and yard signs) used by such committee in connection with volunteer activities on behalf of nominees of such party: Provided, That—

(1) such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;

(2) such payments are made from contributions subject to the limitations and prohibitions of this Act; and

(3) such payments are not made from contributions designated to be spent on behalf of a particular candidate or particular candidates; ...

(xi) the payment by a State or local committee of a political party of the costs of voter registration and get-out-the-vote activities conducted by such committee on behalf of nominees of such party for President and Vice President: Provided, That—

(1) such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;

(2) such payments are made from contributions subject to the limitations and prohibitions of this Act; and

(3) such payments are not made from contributions designated to be spent on behalf of a particular candidate or candidates ....

*See also id.* at 30101(9)(iv), (viii), and (ix) (same for "expenditure" definition). *See also* 11 C.F.R. 100.80, 100.87, 100.140, and 100.147 (same exemptions).

**43.** Local committees do not become political committees just for doing federal election activity, unless the activity otherwise triggers PAC status, *Local Party Activity* at 5:

"[A] payment of federal or 'Levin' funds for FEA will not count toward a local party organization's $1,000 registration threshold, unless the payment would otherwise meet the definition of an expenditure. [52] U.S.C. § [30101](9)(A); 11 CFR 300.36(a)(2). However, a payment of funds for an exempt party activity ... that refers to a clearly identified federal candidate does count towards a local party organization's $5,000 [per calendar year] registration threshold [for political-committee status].

*See also* 11 C.F.R. 300.36(a)(2) (same).

**44.** Similarly, federal election activity qualifying as "electioneering communications," 52 U.S.C. 30101(20) (targeted, broadcast ads identifying federal candidates in 30- and 60-day periods before primary and general elections), "does not count towards any registration threshold,

unless it otherwise qualifies as a 'contribution' or 'expenditure.' [52] U.S.C. § [30104](f)(3)(B)

(ii); 11 CFR 100.29(c)(3)." *Local Party Activity* at 10.

### G. Allocation Rules for Mixed Activities that Are Not Federal Election Activity

**45.** FEC provides rules for allocating (between federal and nonfederal funds) "expenditures

and disbursements in connection with both Federal and non-Federal elections" by state and local

committees and party committees, 11 C.F.R. 106.7(b), *excluding federal election activity*, which

may not be so allocated after BCRA, 11 C.F.R. 106.7(e). To the extent Plaintiffs succeed on their

challenges here, they will again be able to allocate federal election activity as follows.

**46.** FEC allows such allocation of "salaries, wages, and fringe benefits"; "administrative

costs"; "exempt party activities that are not Federal election activities"; "certain fundraising

costs"; and "voter-drive activities that do not qualify as Federal election activities and that are not

party exempt activities." 11 C.F.R. 106.7(c) (capitalization and italicization altered).

**47.** Under 11 C.F.R. 106.7(d)(1), such entities may allocate salary, wages, and benefits based

on employee time spent on activities per month as follows: (**a**) payment may be allocated where

the employee spends up to 25% of time "on Federal election activities or activities in connection

with a Federal election"; (**b**) payment must be from all federal funds if the employee spends over

25% of time "on Federal election activities or activities in connection with a Federal election";

and (**c**) payment may be from all nonfederal funds where the employee spends no time "on Fed-

eral election activities or activities in connection with a Federal election."

**48.** Under 11 C.F.R. 106.7(d)(2), "administrative costs" are allocated to federal funds at least

as follows in an election year (even year) *and the preceding year*[10]: (**a**) 28% with Presidential but

---

[10] This two-year cycle requires LAGOP to allocate *in 2015*—when Louisiana has only *state* elections—as if there were federal Senate, Congressional, and Presidential elections because such federal elections will occur *in 2016*.

no Senatorial election; (**b**) 36% with Presidential and Senatorial election; (**c**) 21% with Senatorial but no Presidential election; (**d**) 15% without Presidential or Senatorial election.

49. Under 11 C.F.R. 106.7(d)(3), "exempt party activities and voter drive activities that are not Federal election activities" are allocated to federal funds at least as follows in an election year and the preceding year: (**a**) 28% with Presidential but no Senatorial, election; (**b**) 36% with Presidential and Senatorial election; (**c**) 21% with Senatorial but not Presidential election; (**d**) 15% without Presidential or Senatorial election.

50. Under 11 C.F.R. 106.7(d)(4), if federal and nonfederal funds are raised in joint fundraising, "[t]he committee must allocate its fundraising costs based on the ratio of funds received into its Federal account to its total receipts from each fundraising program or event."

51. Under 11 C.F.R. 106.7(e), no federal/nonfederal allocation is allowed for (**a**) "activities that refer only to one or more candidates for federal office"; (**b**) "[s]alaries and wages for employees who spend more than 25% of their compensated time in a given month on activities in connection with a Federal election"; and (**c**) "[a]ctivities that are federal election activities."

### H. Restrictions on Candidate/Officeholder Involvement with Nonfederal Funds

52. Political party officials, political candidates, and officeholders are restricted regarding nonfederal funds as follows: (**a**) national-party committees "may not solicit, receive, or direct to another person a contribution, donation or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of [FECA]," 52 U.S.C. 30125(a); (**b**) federal candidates and officeholders may "not[] solicit, receive, direct, transfer, or spend funds in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of [FECA]," 52 U.S.C. 30125(e); and (**c**) state and local candi-

dates and officeholders "may not spend any funds for a communication described in
30101(20)(A)(iii) [PASO communication] of this title unless the funds are subject to the limita-
tions, prohibitions, and reporting requirements of [FECA]," 52 U.S.C. 30125(f)(1).

### I. FEC Rulemaking and Litigation on Federal-Election-Activity Definitions

**53.** FEC's litigation summary regarding its BCRA rulemaking and the *Shays v. FEC* cases is
available at http://fec.gov/law/litigation_CCA_S.shtml#shays_06. The summary explains the
holding from *Shays v. FEC*, 528 F.3d 914 (D.C. Cir. 2008) ("*Shays-III*"), as relevant here:

> **Definitions of GOTV and Voter Registration Activity.** The court of appeals upheld the dis-
> trict court's decision to remand the definitions of "GOTV" and "voter registration activity."
> The court held that the definitions impermissibly required "individualized" assistance direct-to-
> wards voters and thus continued to allow the use of soft money to influence federal elections,
> contrary to Congress' intent.

*Id.* That 2008 holding, rejecting FEC's individualized-assistance approach, led to the broad defi-
nitions those two terms now employ, which include "encouraging or urging" registration and vot-
ing "by any ... means," 11 C.F.R. 100.24(a)(2)(i)(A) and (3)(i)(A).

**54.** In 2002, FEC "define[d] voter registration activity to encompass *individualized* contact for
the specific purpose of *assisting* individuals with the process of registering to vote.... The Com-
mission ... expressly rejected an approach whereby merely encouraging voter registration would
constitute Federal election activity." FEC, "Prohibited and Excessive Contributions: Non-Federal
Funds or Soft Money," 67 Fed. Reg. 49063, 49066 (July 29, 2002) ("2002 E&J ") (emphasis
added). FEC said it "must define GOTV in a manner that distinguishes ... [it] from ordinary or
usual campaigning that a party committee may conduct on behalf of its candidates.... [I]f GOTV
is defined too broadly, the effect of the regulations would be to federalize a vast percentage of
ordinary campaign activity." *Id.* Consequently, *id.* (emphasis in original):

the Commission adopt[ed] a definition of "GOTV activity" as "contacting registered voters

* * * to assist them in engaging in the act of voting." This definition is focused on activity that is ultimately directed to *registered* voters, even if the efforts also incidentally reach the general public. Second, GOTV has a very particular purpose: assisting registered voters to take any and all necessary steps to get to the polls and cast their ballots, or to vote by absentee ballot or other means provided by law. The Commission understands this purpose to be narrower and more specific than the broader purposes of generally increasing public support for a candidate or decreasing public support for an opposing candidate.

**55.** In 2004, *Shays v. FEC*, 337 F. Supp. 2d 28 (D.D.C. 2004), *aff'd*, 414 F.3d 76 (D.C. Cir. 2005), held that FEC did not provide adequate notice of its approach, remanding for rulemaking. In 2006, FEC "retain[ed its] ... definitions of 'voter registration activity' and 'GOTV activity,' which exclude mere encouragement of registration and/or voting," *id.* at 8928, explaining that mere encouragement "would be overly broad." "Definition of Federal Election Activity," 71 Fed. Reg. 8926, 8929 (Feb. 22, 2006) ("2006 E&J"). It reaffirmed "that these definitions will not lead to circumvention of FECA because the regulations prohibit the use of non-Federal funds for disbursements ... for ... activities ... actually register[ing] individuals to vote." *Id.*

**56.** In 2008, *Shays-III* noted that FEC defended its individualized-assistance definitions on two bases: (**a**) a need to avoid capturing brief, incidental exhortations appended to speeches or events, which the court said could be dealt with by an exemption, and (**b**) providing a bright line, which the court said was only an argument for bright lines. 528 F.3d at 932. *Shays-III* made no mention of any First Amendment arguments against overbroad definitions.

**57.** In 2010, noting that *Shays-III* rejected its individualized-assistance approach, FEC adopted definitions sweeping in "encouraging or urging" registration or voting "by any ... means" (except for brief *and* incidental exhortations). 2010 E&J, 75 Fed. Reg. at 55260-64.

**58.** However, FEC reiterated its rationales for its earlier positions, *see* ¶¶ 54-55, and a rationale based on *McConnell v. FEC*, 540 U.S. 93 (2003):

In reaching its decision, the Court noted that BCRA regulated only "those contributions to state

and local parties that can be used to benefit Federal candidates directly" and therefore posed the greatest threat of corruption. *Id.* at [167]. As such, the Court found BCRA's regulation of voter registration activities, which "directly assist the party's candidates for federal office," and GOTV activities, from which Federal candidates "reap substantial rewards," to be permissible methods of countering both corruption and the appearance of corruption. *Id.* []; see also *id.* [] (finding that voter registration activities and GOTV activities "confer substantial benefits on federal candidates" and "the funding of such activities creates a significant risk of actual and apparent corruption," which BCRA aims to minimize).

2010 E&J, 75 Fed. Reg. at 55258.

**59.** FEC reiterated that "its 2006 E&J [said] that its [original] regulations would not lead to the circumvention of the Act precisely because they captured 'the use of non-Federal funds ... for those activities that actually register individuals to vote.'" *Id.* at 55259 (citation omitted).

**60.** The 2010 E&J said a "commentator argued that the Commission should exempt from the definition of voter registration activity [and 'GOTV activity'] all Internet communications, stating that such communications are made at 'virtually no cost.'" *Id.* at 55261 and 55263. That commentator was the Democratic National Committee ("DNC"), by counsel Rebecca H. Gordon, and DNC's arguments went beyond "virtually no cost." DNC said FEC should "create an exception ... for voter registration and GOTV messages ... conveyed though the internet," which FEC "could accomplish ... very simply by limiting the covered communications to those that qualify as 'public communications' under current regulations." DNC Comments at 4.[11] DNC explained:

> In its 2006 rulemaking on Internet Communications, the Commission explicitly acknowledged that the unique features of the internet—in particular its accessibility, low cost, low barrier to entry, and interactive features—merited regulatory restraint. *See* Internet Communications, 71 Fed. Reg. 18,589 ... ("[T]he Commission recognizes the Internet as a unique and evolving mode of mass communication and political speech that is distinct from other media in a manner that warrants a restrained regulatory approach."). This position of restraint led the Commission to ... exclude from the disclaimer requirements, the coordination rules, and other regulatory provisions most communications made over the internet.

DNC Comments at 3. Denying the exception "exacts too high a cost on political speech[,] ... con-

---

[11] Available at http://sers.fec.gov/fosers/showpdf.htm?docid=10065.

travenes the Commission's stated views about internet communications, and fails to advance Congress's stated purpose ... to reduce the flow of so-called 'soft money' in federal elections." *Id.*

**61.** In the cited "Internet Communications" E&J, 71 Fed. Reg. 18589 (April 12, 2006), FEC justified its definition of "public communications," which is incorporated into the generic-campaign-activity and PASO-communication definitions, 11 C.F.R. 100.25 and 100.24(b)(3). The public-communication definition excludes Internet communications, "except for communications placed for a fee on another person's Web site." 11 C.F.R. 100.26. So

> a State party committee that pays to produce a video that PASOs a Federal candidate will have to use Federal funds when the party committee pays to place the video on a Web site operated by another person. This is ... consistent with how the party committee would be required to pay for a communication that it distributes through television or any other medium that is a form of "public communication." In such circumstances, the party committee must pay the costs of producing and distributing the video entirely with Federal funds. See 11 CFR 300.32(a)(2).

71 Fed. Reg. at 18597. Thus, state committees posting generic-campaign-activity or PASO communications on their *own* website would not be doing federal election activity.

**62.** The "Internet Communications" E&J also said, 71 Fed. Reg. at 18597,

> one reason [FEC] ... excluded Internet activities from the ... 'public communication' [definition] ... was to permit State ... and local party committees to refer to their Federal candidates on the committees' own Web sites or post generic campaign messages without requiring that the year-round costs of maintaining the Web site be paid entirely with Federal funds.

So federal-election-activity communications on a state-committee website would require the committee to pay the year-round costs of the website, including costs swept in by a "ripple effect," because, 71 Fed. Reg. at 18597 n.37,

> the Commission is not convinced that the statute permits time/space allocation of any "public communication" that features PASO information about a Federal candidate. The existence of PASO would require the organizations to pay for the "public communications," i.e., the Web site itself, entirely with Federal funds. Such a result is inconsistent with the Act's regulation of Federal, but not non-Federal activity. For example, such a determination could have a ripple effect on the payment of other costs. The acquisition of the computers or the phone line (two costs that are generally allocated as administrative expenses) arguably could become expenses

**Verified Complaint**                              21

that would be required to be paid for entirely with Federal funds because one of the uses of the equipment would be to access or maintain a Web site.

**63.** Despite these justifications, FEC did *not* exclude Internet communications from voter-registration-activity and GOTV-activity definitions. The "[e]ncouraging or urging" portions of the definitions, 11 C.F.R. 100.24(a)(2)(i)(A) and(3)(i)(A), are *not* limited to "public communications" and expressly *include* communications "by ... e-mail ... or by any other means."

**64.** The brief-and-incidental exceptions to the voter-registration-activity and GOTV-activity definitions require a "brief exhortation ... incidental to a communication, activity, or event." 11 C.F.R. 100.24(a)(2)(ii) and (3)(ii). "[T]he exception[s] operate[] identically," 75 Fed. Reg. 55263, as follows, 75 Fed. Reg. at 55261-62 (emphasis in original):

> To qualify for the exception, the exhortation to register to vote must be both brief *and* incidental. Exhortations to register to vote that go on for many minutes of a speech, for example, or that occupy a large amount of space in a mailer are not brief and will not qualify .... Similarly, exhortations, however brief, must also be incidental to the communication, activity or event. For example, a one-line exhortation to "Register to vote!" appearing at the end of a campaign flier would be incidental to the larger communication, whereas a communication stating only "Register to Vote by October 1st!" and containing no other text would not be incidental and, thus, would not come within the exception from the definition of "voter registration activity."
>
> The exception applies to brief, incidental exhortations regardless of the forum or medium in which they are made. The exception covers an exhortation offered in a speech at a rally, for example, as well as one appearing in an e-mail.
>
> Two examples ... that would be covered under the exception appear at new paragraphs (a)(2)(ii)(A) and (a)(2)(ii)(B) of 11 CFR 100.24. The first example is a mailer praising the public service record of a mayoral candidate and/or discussing the candidate's campaign platform. The mailer concludes by reminding recipients: "Don't forget to register to vote for [the mayoral candidate] by October 1st." The second example involves a phone call for a State party committee fundraising event. The call provides recipients with information about the event, solicits donations, and concludes by reminding the listener: "Don't forget to register to vote."

So emails with the *topic* of exhorting registration/voting will not be incidental, and *extended* exhortations (beyond such one-liners) to register/vote in emails or on a website would not be brief.

**65.** Neither 11 C.F.R. 100.24 nor the 2010 E&J define "encouraging or urging." The Notice of Proposed Rulemaking ("NPRM") had proposed definitions with "encouraging or assisting" but

not "urging." FEC, "Definition of Federal Election Activity," 74 Fed. Reg. 53674, 53680 (Oct.

20, 2009) ("2009 NPRM"). The 2010 E&J indicated that FEC used "encouraging" because "the

*Shays III* court suggested that the Commission's regulations should reach ... efforts that '*encourage* people to vote or to register to vote.'" 75 Fed. Reg. at 55261 (emphasis in original). The

2010 E&J did not explain why "urging" was added nor how it differs from "encouraging."

**66.** "Encouraging or urging" apparently both mean "exhorting" because the brief-and-

incidental-exhortation exceptions, 11 C.F.R. 100.24(a)(2)(ii) and (3)(ii)), consistently use "exhor-

tation" and "exhorting" as synonyms for "encouraging or urging." Constitutionally, the "exhort-

ing" must be *express* and specifically about *the acts of registration and voting*. *See Buckley*, 424

U.S. at 42-44 (construing "advocating," as "expressly advocating," then construing that to require

"express words of advocacy" to avoid unconstitutional vagueness and overbreadth). So "Vote for

O'Malley" would not be federal election activity because it does not expressly advocate registra-

tion or voting, though it might "encourage" voting. *See* ¶ 68 (discussing this problem identified

at the rulemaking hearing). So Plaintiffs describe their intended activities as "exhorting" registra-

tion/voting, meaning expressly exhorting potential voters to the acts of registering/voting.

**67.** At the December 16, 2009 rulemaking hearing, commenters argued against an "encourag-

ing" definition. *See* Transcript, http://sers.fec.gov/fosers/showpdf.htm?docid=10056. For exam-

ple, Brian Svoboda, for the Democratic Legislative Campaign Committee, argued against "en-

couraging," Transcript at 26-29, and for a voter-mobilization definition

> to capture those spheres of activity that genuinely are intended to mobilize, not simply to per-
> suade people to vote for a state or local candidate, because at bottom, this whole business is
> about getting people to vote on Election Day, everything they do from beginning to end, but
> looking at that special subset of activity that's actually directed toward voter mobilization.

Transcript at 22. *See also id.* at 30-31 (Svoboda: same persuasion-mobilization distinction).

**Verified Complaint** 23

**68.** Paul S. Ryan, for Campaign Legal Center, argued: "[I]t is in fact possible and even likely that a particular communication will fall into both categories of persuasive and get-out-the-vote type of activity. But Congress was clear that those types of communications, if they constitute get-out-the-vote activity, they're covered by these provisions of BCRA." *Id.* at 36. He insisted the voter-registration-activity and get-out-the-vote definitions must include "encourage." *Id.* at 24. He said "get out to vote for O'Malley" or "go vote for O'Malley" *would* be federal election activity, while "vote for O'Malley" would *not* be. *Id.* at 83. This was also so if "vote for O'Malley" were accompanied by the election date because "Congress decided to cover get-out-the-vote type communications and ... not ... straightforward express advocacy for a single candidate," *id.* at 84, though he did not dispute that "Vote for O'Malley ... [is] encouraging you to go vote," *id.*

### J. FEC Political Party Forum on Federal Election Activity Problems

**69.** On June 4, 2014, FEC "Chairman Lee Goodman and Vice Chair Ann M. Ravel ... hosted a public forum" on the challenges faced by political parties ....." *See* FEC, News Release (June 4, 2014) (available at www.fec.gov/press/ press2014/news_releases/20140604release.shtml). The audio recording is at www.fec.gov/audio/2014/20140604_FORUM.mp3 ("Audio").

**70.** In the forum, lawyers for, and representatives of, state and local committees explained problems created by federal-election-activity laws and regulations, the need for changes, and how FEC could help, but to date no related regulatory changes have resulted.

**71.** For example, the first extended presenter at the forum was Ken Martin, Chairman of the Minnesota Democratic Farmer Labor Party. Audio at 4:16-8:42. He testified that he had worked in the non-political-party, independent-expenditure world before coming to work in the political-party context and on arrival was "shocked at how over regulated state parties are." He noted that though political parties are good and accountable, they are increasingly unable to assist their can-

didates vis-a-vis independent-expenditure groups due to BCRA. "Candidates and state parties are losing control over their voice," he testified. In December 2012, Martin asked the Association of State Democratic Chairs to establish a committee to help level the playing field and help build up parties to be able to help their candidates. ASDC established the Committee on Campaign Finance Reform ("CCFR") which issued "Legislative Recommendations for Campaign Finance Reform,"[12] which document was distributed at the FEC forum. The Recommendations document was approved and its proposals are the subject of supportive resolutions by many Democratic state parties, as part of the campaign to improve their ability to engage in federal election activity. Martin declared, "It's my sincere belief that if we do not address the growing imbalance of political money flowing towards unregulated shadow organizations, we may very well see the end of political parties at the state and local level." Audio at 7:49.

**72.** The next presenter was Scott Arceneaux, Executive Director of the Florida Democratic Party, who explained that the vast majority of a state party's efforts are nonfederal, "[y]et you're seeing this slow federalization of all the activities that we do, for no ... solid, good policy reason." Audio at 10:55. He added, Audio at 13:36:

> [A]ll this has created what I call the federalization of state parties. We are basically becoming fifty mini federal committees because the ever-expanding definition of federal election activity is basically slowly, slowly encompassing everything we do until we are essentially, at some point in time—a date determined with some bit of ambiguity—a federal committee. And what that means in reality is that nonfederal candidates don't want to work with us.

**73.** CCFR's "Legislative Recommendations for Campaign Finance Reform" ("*Recommendations*") makes observations and recommendations, including the following:

**Repeal Levin Amendment or create reasonable definitions for "Federal election activity"**
Under McCain-Feingold, how state parties pay for their activities is determined, in large part, by the extent to which such activities are classified as "Federal election activity" under that law. After extensive hearings and careful consideration, the FEC in 2002 issued thoughtful, practical

---

[12] Available at http://images.politico.com/global/2014/02/14/asdc_recs_081213.pdf.

**Verified Complaint**                                    25

yet rigorous regulations defining these activities. These definitions have been challenged by so-called "reform" organizations in a series of court cases which have forced the FEC in some cases to modify its definitions and in other cases have left the definitions in a state of confusion and uncertainty. Under the most recent iteration of the definition of "get-out-the-vote" almost all campaign activity is subsumed within the definition pulling most campaign activity within the definition even if no federal candidates are referenced in the communications. The Levin Amendment is too complicated to administer and several state parties have decided to just federalize their get-out-the-vote programs due to the complexity of administering and complying with the Levin Amendment. In addition, due the continual expansion of the definitions of "get-out-the-vote" as well as the additional problems created by the concept of "federal election activity," **Congress should consider repealing these provisions and allow party committees to undertake activities in accordance with rules in place prior to the passage of McCain-Feingold**.

*Recommendations* at 1-2 (underline and bold in original). *Recommendations* adds that "House-added restrictions have rendered the so-called 'Levin amendment' completely useless. The restrictions serve no discernible policy purposes and should be eliminated." *Id.* at 2-3 (bold removed). And *Recommendations* highlights problems with the 25% employee rule and mandatory monthly reporting thus, *id.* at 3 (underline and bold in original):

<u>**Payment of Staff Payroll and Benefits**</u>
   Under McCain-Feingold, employees who work more than 25% of their time in connection with federal elections must be paid for exclusively with federal funds. However, the FEC has interpreted this statute to not only include federal activity but also "federal election activities." Therefore, merely working on generic or non-federal activity has triggered federal payroll requirements. For example, if a state party hires employees to go door-to-door to do a voter identification project for a state or local candidate, those employees must be paid exclusively with federal funds. This has created a disincentive for party committees to engage in non-federal voter id or non-federal get-out-the-vote projects, even if there are no competitive federal races on the ballot. **Congress should either repeal this provision or clarify that it did not intend for the provision to include "federal election activities."**
<u>**Repeal mandatory monthly filing for state party committees**</u>
   Under current law, state party committees must file FEC reports monthly if they spend funds on "federal election activity." This has imposed a huge burden on state parties. **State parties should be allowed to file quarterly; alternatively the thresholds for triggering monthly filing should be narrowed.**

## Plaintiffs' Intended Independent Federal Election Activity

**74.** Plaintiffs LAGOP, JPGOP, and OPGOP intended to do independent federal election activ-

ity in 2014 without complying with challenged provisions, had it been legal to do so, and they intend to do so in 2015 and future years, when legal to do so. Examples are provided below.

**75.** LAGOP currently complies with the Ban, Fundraising Requirement, and Reporting Requirement by using all federal funds from a federal account for federal election activity. But its ability to do desired federal election activity is burdened by the inability to allocate costs to nonfederal funds as allowed before BCRA, and it cannot do some desired federal election activity due to this inability. LAGOP reasonably believes that it will have sufficient funds to pay for some or all of the examples of federal election activity described below if it may allocate them as possible absent the challenged provisions. But it will not do some or all of the examples described below absent requested relief.

**76.** JPGOP and OPGOP do not currently do federal election activity because of the complexity and burden of compliance, including creating a federal account to fund such activity, they want to do independent federal election activity without complying with the challenged provisions, and they will not do their intended activities absent requested relief.

**77.** The examples described below are planned to occur in relevant federal-election-activity periods relating to elections in 2016 and beyond and fit federal-election-activity definitions.

*A. Independence*

**78.** The examples of federal election activity Plaintiffs want to do will be independent.

**79.** Coordination is defined for *non-communication* activity at 11 C.F.R. 109.20.

**80.** But "[a] *communication* is coordinated" if it meets the "coordinated communication" standards. 11 C.F.R. 109.21 (emphasis added). For "[p]olitical party committees," 11 C.F.R. 109.30, "[a] political party communication is coordinated" if it meets the "party coordinated communica-

tion" standards. 11 C.F.R. 109.37.[13] *See also* 11 C.F.R. 100.16 ("A *communication* is 'made in cooperation ... with ... a candidate ...' if it is a coordinated communication under 11 CFR 109.21 or a party coordinated communication under 11 CFR 109.37." (emphasis added)).

**81.** *Coordinated communications* have content and conduct standards, 11 C.F.R. 109.21(a):

**§ 109.21 What is a "coordinated communication"?**
(a) *Definition.* A communication is coordinated with a candidate, an authorized committee, a political party committee, or an agent of any of the foregoing when that communication:
    (1) is paid for, in whole or in part, by a person other than that candidate by a person other than that candidate, authorized committee, or political party committee;
    (2) satisfies at least one of the content standards in ... this section; and
    (3) satisfies at least one of the conduct standards in ... this section.

**82.** A *party coordinated communication* has content and conduct standards that overlap and differ from those for "coordinated communication," 11 C.F.R. 109.37:

**§ 109.37 What is a "party coordinated communication?**
(a) *Definition*. A political party communication is coordinated with a candidate, a candidate's authorized committee, or agent of any of the foregoing, when the communication satisfies the conditions set forth in paragraphs (a)(1), (a)(2), and (a)(3) of this section.
    (1) The communication is paid for by a political party committee or its agent.
    (2) The communication satisfies at least one of the content standards ... of this section....
    (3) The communication satisfies at least one of the conduct standards ....

**83.** Under both the "coordinated communication" and "party coordinated communication" definitions, emails and own-website postings cannot be coordinated because the content requirements reach only "public communications" or "electioneering communications," and the definitions of those exclude Internet communications. *See* 11 C.F.R. 100.26 (not excluding "communications placed for a fee on another person's Web site") and 100.29.

**B. Communications Exhorting Registration (VR) and Voting (GOTV)**

**84.** Plaintiffs want to make non-individualized communications exhorting registration and

---

[13] Because 11 C.F.R. subpart D governs "[p]olitical party committees," 11 C.F.R. 109.30, the "party coordinated communication" definition governs whether *LAGOP*'s communications are coordinated. The *other* plaintiffs are *not* "political committees" and thus not "political party committees," so the "coordinated communication" definition governs their communications.

voting during applicable federal-election-activity periods that will be VR (voter-registration ac-

tivity) and GOTV (get-out-the-vote activity) under the "encouraging or urging" standard of 11

C.F.R. 100.24(a)(2)(i)(A) and (3)(i)(A). Non-individualized communications would not have

been VR or GOTV under FEC's 2002 regulations because they will be in substantially similar

form to multiple persons without "individualized contact for the specific purpose of assisting in-

dividuals with the process of registering to vote [or voting]." FEC, 2002 E&J, 67 Fed. Reg. at

49067. *See supra* ¶ 54 (quotes from 2002 E&J). Nine examples follow.

**85.** *First*, LAGOP has on the home page of its *website* a drawn outline of Louisiana, across

which are the words "click here to REGISTER TO VOTE" (linking to www.lagop.com/get-regis-

tered) and below which are the words "Get Registered." *See* www.lagop.com.[14] The imperative

"Get Registered" is "[e]ncouraging or urging potential voters to register to vote," so this commu-

nication must be paid for with all federal funds starting November 6, 2015. Also currently on the

website are Instagram images, one of which says "Geaux Vote Today," which referred to the last

general election but will become get-out-the-vote activity (for exhorting voting) and require all

federal funds for the communication on December 2, 2015, unless it is taken down.

LAGOP has also posted on its website a nonpartisan article merely exhorting registration and

voting without promoting any political party as follows, www.lagop.com/get-registered:

> Your right to vote for public officials and representatives is valuable. It is rare in human his-
> tory. It was hard-won by America's founders.
> Before America gained independence, the colonies were ruled by Great Britain. In the Decla-
> ration of Independence, the founders listed many grievances against British rule, especially the
> lack of representation. The Declaration said King George would not enact needed laws "unless
> ... people ... relinquish[ed] the right of Representation in the Legislature." It said the British
> were "suspending our own Legislatures, and declaring themselves invested with power to legis-
> late for us in all cases whatsoever."

---

[14] The federal-election-activity definition excludes "*[d]e minimis* costs associated with" a
party committee, on its website, "enabling visitors to download a voter registration form ...." 11
C.F.R. 100.24(c)(7)(ii). But the exception seems not to apply to "Get Registered."

The Revolutionary War rejected British rule. America established a republic where citizens select their representatives in government. Yet astonishingly, many people don't register and vote.

As Americans who enjoy the benefits that a democratic society offers, it is our civil duty to actively participate in government by voting. But more importantly, voting allows citizens the opportunity to make direct decisions that better our communities and allows us to build a free and prosperous society. Many people in the world live in places where their voices will not be heard because they are unable to vote. So take a stand to let your voice be heard, and help build a stronger America by registering to vote today!

The Louisiana Secretary of State's website provides valuable information to help you register and vote. For registration information and to register online, see

- www.sos.la.gov/ElectionsAndVoting/RegisterToVote/Pages/default.aspx and
- www.sos.la.gov/ElectionsAndVoting/Pages/OnlineVoterRegistration.aspx.

For voting information, see

- www.sos.la.gov/ElectionsAndVoting/Vote/Pages/default.aspx.

The calendar of elections and deadlines for registration and voting by mail, see

- www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/ElectionsCalendar2016.pdf.

Check out those websites today, and let your voice be heard in 2016!

The article provides hyperlinks to *state* election materials, which do not constitute federal election activity at any time. 11 C.F.R. 100.25(c)(7).[15] And this article is not federal election activity as this Complaint is filed. But it will become voter-registration activity on November 6, 2015 and get-out-the-vote activity on December 2, 2015, if it remains on the website. LAGOP will take it down absent requested relief.

**86.** *Second*, LAGOP wants to *email* the same nonpartisan article in the prior paragraph to potential voters, with the same election-information links as on the website (those excluded from "federal election activity" if done on its *website*, 11 C.F.R. 100.25(c)(7)), if it may do so without complying with challenged provisions. Such an email will be VR beginning November 6, 2015, and GOTV beginning December 2, 2015.

**87.** *Third*, JPGOP and OPGOP want to *email* a nonpartisan article substantially similar to the nonpartisan article described in ¶ 85, with links of the sort excluded from "federal election activ-

---

[15] The federal-election-activity definition excludes "*[d]e minimis* costs associated with" a party committee providing, on its website, hyperlinks to an election-board's site, downloadable registration and absentee-ballot forms, and voting dates, hours, and locations. *Id.*

ity" if done on a *party committee's website*, 11 C.F.R. 100.24(c)(7), if they may do so without complying with challenged provisions. Such an email will be VR beginning November 6, 2015, and GOTV beginning December 2, 2015.

**88.** *Fourth*, LAGOP wants to *mail* communications exhorting potential voters to get out and vote Republican, without promoting, attacking, supporting, or opposing (PASOing) any clearly identified federal candidate, if it may do so without complying with challenged provisions. Such mail will be GOTV starting December 2, 2015. If LAGOP does a "mass mailing," 11 C.F.R. 100.27 (over 500 "substantially similar" pieces in 30 day), the mailings will be a "public communication," 11 C.F.R. 100.26, and so also "generic campaign activity" (GCA) for promoting a political party, 11 C.F.R. 100.25, starting December 2, 2015.

**89.** *Fifth*, LAGOP wants to post a recording of the following script on its website, then broadcast it as a radio ad, if it may do so without complying with challenged provisions:

**DEMOCRAT OUTREACH**
**Republican Party of Louisiana**
**:60 Commercial**
<Folksy>
    Back a couple decades ago, the Republican Party didn't much exist in Louisiana.
    In fact, until Dave Treen became Governor in 1980, I can't think of one elected republican.
    But the democrat party in Louisiana used to be a lot different than it is today.
    Back then we could expect certain things from any Louisiana politician—defending our oil and gas industry, fighting for a strong military and protecting traditional marriage and the life of the unborn.
    The democrats even used to give a damn about a balanced budget and keeping taxes as low as possible.
    But let's face it, the days of the John Breaux democrat are gone.
    The National Democrat Party has moved so far to the left these days, its like they forgot what it means to be an American.
    Supporting gay marriage, and abortion—trying to tax and spend their way outta this recession.
    You may be registered a democrat ... but if you're like me, you probably been voting more often for Republicans than democrats over the last 10 years.
    I didn't even vote for Landrieu this last time. She had just gone too far with the liberals and I had had it.

**Verified Complaint**                         31

That's why I switched my party registration to the Republican Party. And I don't feel like I left the Democrat Party. No sir, I feel like the Democrat Party left me.

On LAGOP's website the recording will be VR starting November 6, 2015. The recording promotes a political party, but the recording cannot be GCA (generic campaign activity, 11 C.F.R. 100.25) while on LAGOP's website because it would not be a public communication, 11 C.F.R. 100.26. If broadcast, it will be a public communication and so GCA starting December 2, 2015.

**90.** *Sixth*, LAGOP wants to post a recording of the following script on its website, then broadcast it as a radio ad, if it may do so without complying with challenged provisions:

**VOTER DRIVE FOR PRESIDENTIAL PRIMARY**
**Republican Party of Louisiana**
**:60 Script**

As you already know, the election for President is this year.

This election is historic. Washington needs new Conservative leadership; another Democrat president would just be more of the same.

And it's important that Republicans pick a strong candidate who can defeat the Democrat candidate.

But if you're not currently registered as a Republican, you won't get to participate in the March 1st Louisiana presidential primary to help pick the Republican nominee.

That's why the Republican Party of Louisiana is launching the greatest voter registration drive in Louisiana history.

On the weekend leading up to "President's Day" (Feb 13-15), the LAGOP will be dispatching to 100 locations throughout the state, creating an easy opportunity for conservative Independents and Democrats everywhere to conveniently switch their party Identification

From Grand Isle, up to Vivian, over to Bastrop and down to Lake Calcasieu - and everywhere in between...Representatives will be set up in a location near YOU.

Go check out SWITCH-G.O.P.-DOT-COM and just type in your zip code and find out the registration location closest to you.

This year, don't let the Republican nominee for president be chosen for you. Get involved. Let your voice be heard.

That's SWITCH-G.O.P.-DOT-COM.

On LAGOP's website the recording will become VR starting November 6, 2015. The recording also promotes a political party, but cannot be GCA on LAGOP's own website because it would not be a public communication. If broadcast, the recording would become a public communication and GCA starting December 2, 1015.

**Verified Complaint**                    32

**91.** *Seventh*, LAGOP wants to mail communications to conservative Democrats and independents exhorting them to register as Republicans, enclosing instructions and forms for switching, if it may do so without complying with challenged provisions, This will be followed up with phone calls for the same purpose. This will also be followed up with a door-to-door campaign for the same purpose, if resources permit. Such mail will be VR starting November 6, 2015. If LAGOP does a mass mailing, 11 C.F.R. 100.27, the mailings will be a public communication, 11 C.F.R. 100.26, and so GCA, 11 C.F.R. 100.25, starting December 2, 2015.

**92.** *Eighth*, LAGOP wants to mail communications exhorting individuals to register as Republicans, targeted to new state residents identified as Republicans in their former state of residence and high school and college students eligible to register, and providing instructions and forms for registering, if it may do so without complying with challenged provisions. Such mail will be VR starting November 6, 2015. If LAGOP does a mass mailing, 11 C.F.R. 100.27, it will be a public communication, 11 C.F.R. 100.26, and so GCA, 11 C.F.R. 100.25, starting December 2, 2015.

**93.** *Ninth*, Louisiana has a program for those 65 or older, or with a disability, to vote absentee and automatically receive absentee ballots. *See* www.sos.la.gov/ElectionsAndVoting/Pages/DisabledElderlyCitizens.aspx. LAGOP wants to mail communications exhorting Republicans and conservative voters fitting the criteria to sign up for this program, if it may do so without complying with challenged provisions. Such mail will be GOTV starting December 2, 2015. If LAGOP does a mass mailing, 11 C.F.R. 100.27, it will be a public communication, 11 C.F.R. 100.26, and so also GCA, 11 C.F.R. 100.25, starting December 2, 2015.

### C. Voter-Identification (VID) Communications

**94.** LAGOP wants to make communications that will be VID (voter identification), 11 C.F.R. 100.24(a)(4), because they will be designed to "acquire[] information about potential voters,"

including "verifying or adding information about the voters' likelihood of voting in an upcoming election or their likelihood of voting for specific candidates," *id.*, if it may do so without complying with challenged provisions.

**95.** For example, LAGOP wants to communicate with potential voters asking them to provide information about their generic identification (conservative, liberal, libertarian, etc.), their likelihood of voting in coming elections, and their likelihood of voting for certain candidates. These communications will include non-individualized mail requests for such information, i.e., multiple pieces with substantially similar language but variation in nonmaterial details, such as recipient name and address. (Communications need not be "public communications" to be VID.)

**96.** LAGOP plans, in the fall of 2015, to use nonfederal funds to engage in VID related to state legislative and gubernatorial candidates, which in itself would not be federal election activity. LAGOP wants to use that VID information in 2016. But if LAGOP uses that VID information "in a subsequent election in which a Federal candidate appears on the ballot," the 2015 VID would retroactively become federal election activity. *See* 11 C.F.R. 100.24(a)(4) and (c)(5). LAGOP must either sideline the 2015 VID information for 2016 (when federal candidates will be on the ballot) or comply with federal-election-activity requirements for its 2015 VID. LAGOP asserts that there is no constitutional justification for foreclosing its use of 2015 VID in 2016.

### D. Generic-Campaign-Activity (GCA) Communications

**97.** LAGOP wants to make public communications that will be GCA, i.e., "public communication[s] ... promot[ing] ... a political party and ... not promot[ing] or oppos[ing] a clearly identified ... candidate," 11 C.F.R. 100.25, if it may do so without complying with challenged provisions. Examples follow.

**98.** LAGOP wants to make audio recordings explaining what it stands for, to be posted on

LAGOP's website, where they will *not* be GCA because not public communications, 11 C.F.R.

100.26. But LAGOP also wants, if it may do so without complying with challenged provisions,

to air radio ads from these recordings during coming federal-election-activity periods, the next

starting December 2, 2015, when they *will* be public communications and so GCA. An example

of such ads is "Democrat Outreach," *supra* ¶ 89, which fits both VR and GCA definitions.

**99.** Another example of a recording to be placed online, then broadcast in 2016, follows:

**AFRICAN-AMERICAN OUTREACH**
**Republican Party of Louisiana**
**:60 Script**
February is Black History Month.
  It is a time to honor those who have fought to secure freedom and prosperity for our people.
  A great distinction must be attributed to the Republican Party, which was FOUNDED in 1854
with one simple creed: that "Slavery is a violation of the rights of man."
  You see, the movement to end slavery and the creation of the Republican Party were one and
the same.
  Abolitionist leaders like Harriet Tubman and Sojourner Truth were committed Republicans.
Frederick Douglass was one of the party's early champions.
  The first Republican President was Abraham Lincoln—author of the Emancipation Proclama-
tion.
  Republicans voted unanimously for the 13th Amendment, which abolished slavery.
  The Republican Party has never been the party of white Americans. Or Black Americans. It is
the party for all Americans ... promoting freedom, justice and equal opportunity for all.
  FEMALE VO: This moment in black history has been brought to you by the Republican Party
of Louisiana.

**100.** Another example of a recording to be placed online, then broadcast in 2016, follows:

**YOUTH OUTREACH SCRIPT - "The R Word"**
**Republican Party of Louisiana**
**:60 Script**
  In 2008, I eagerly voted for Barack Obama. I was 19 and it was my first time to ever vote. I
liked his message of "Hope & Change" and he seemed a lot different than George Bush.
  And even though I felt a little let down by the first 4 years, I hesitantly voted for him again in
2012.
  But now that I'm older, I've really started to learn a little more about the two parties. I realize
now that democrats like Barack Obama want to solve every problem by just creating some new
government agency.
<sarcasm>
  Y'know ... because when I think of "cool," I think of "bureaucracy."

**Verified Complaint**                    35

Also, the economy still seems really bad. Tons of my friends are having trouble finding real jobs and a lot of them still live at home.

Obama also promised peace throughout the world, but I realize now that I was a little naive to believe him. The world is a bigger mess than I can ever remember.

The democrats always talk about "freedom," but ironically it's really the Republicans who are the ones whose policies really create liberty.

The democrats are always screaming for more government to fix everything, but the Republicans are the only ones ever talking about "less government."

That includes Less Taxes—so that people who own businesses have more money to hire people. That makes sense to me now.

I don't know why I ever associated more government, higher taxes and more bureaucracy with the word "cool."

So this election, I'm keeping an open mind. And I'm not ready to call myself the "R-word" ... but I gotta admit, when I listen to the debates ... I find myself identifying more with the R-candidates than the Democrats—who just sound like more "hope & change."

### E. PASO Communications

**101.** LAGOP wants to make PASO communications ("public communications" that will be deemed to promote, attack, support, or oppose a federal candidate, 11 C.F.R. 100.24(b)(3)), without express advocacy, when legal to do so without complying with challenged provisions. Examples follow.

**102.** LAGOP wanted in 2014 to make public communications that would have criticized U.S. Senator Mary Landrieu, then a federal candidate, for her support of government policies, such as Obamacare, without expressly advocating her defeat.

**103.** LAGOP wants to put on its website, then broadcast, in early 2016, "Voter Drive for Presidential Primary," *see* ¶ 90, but with the first three paragraphs edited to read thus:

As you already know, the election for President is this year.

This election is historic. Washington needs new Conservative leadership; ~~another Democrat president~~ Hillary Clinton would just be more of the same.

And it's important that Republicans pick a strong candidate who can defeat the ~~Democrat candidate~~ Clinton Machine....

On LAGOP's website, this would be VR starting November 6, 2015, but it would not be a PASO communication because it would not be a public communication. If broadcast, it would become a

public communication and a PASO communication.

**104.** LAGOP wants to put on its website, then broadcast, in 2015 and/or 2016, "Youth Out-

reach Script," *see* ¶ 100, but edited with the last paragraph thus:

> So this election, I'm keeping an open mind. And I'm not ready to call myself the "R-word" ...
> but I gotta admit, when I listen to the debates ... I find myself identifying more with the
> R-candidates than ~~the Democrats~~ <u>Hillary</u>—who just sound<u>s</u> like more "hope & change."

On the website, this would not be a public communication, so neither GCA nor PASO. If broad-

cast, it might be deemed PASO, making it *not* GCA. The equation of "Hillary" to "more 'hope &

change'" is descriptive, with hearers viewing her favorably or unfavorably depending on their

opinion of "hope & change." FEC would likely deem this a PASO communication.

**105.** LAGOP wants to post on its website, then broadcast on radio, in 2015 and/or 2016,

"Celebrating Jindal," following this script:

> **CELEBRATING JINDAL**
> **Repubican Party of Louisiana**
> **:30 Commercial**
>
> In 2008, Louisiana's state government was out of control, having tripled in size in just 12
> years. Then came Bobby Jindal.
> And since becoming governor, Jindal has cut the state budget by more than 26% Louisiana
> now has 30,000 fewer public employees and our reputation across the country has never been
> better.
> Governor Jindal was one of the first governors in the United States to create a School Choice
> program to help children escape failing schools.
> Let's face the facts. Bobby Jindal has been the nation's finest example of a Republican
> leader, refusing to compromise on all of the major conservative issues: taxes, spending, abor-
> tion, guns, school choice, religious liberty, you name it.
> As his tenure ends here, Louisiana's loss is America's gain, as Governor Jindal travels across
> America spreading his message of freedom and traditional values.
> Bobby Jindal. Proven leadership for America.

On LAGOP's website, this would not be a public communication, so it could not be a PASO

communication. When broadcast, the support for a clearly identified federal candidate would

make this a PASO communication.

**Verified Complaint**          37

### F. Employee Services

**106.** LAGOP wants, when legal without complying with challenged provisions, to make federal/nonfederal allocation of "[s]alaries, wages, and fringe benefits paid for employees who spend more than 25% of their compensated time in a given month on [independent] Federal election activities or on [independent] activities in connection with a Federal election," 11 C.F.R. 106.7(d)(1)(i)-(ii), as allowed for spending 25% or less on such activities, 11 C.F.R. 106.7(1)(d).

### H. Independent Federal-Election-Activity Funding

**107.** In paying for intended independent federal election activities, Plaintiffs want to use nonfederal funds, on hand or to be raised, compliant with state law and applicable federal law, other than challenged provisions, including:

- BCRA's ban on nonfederal funds for national-party committees, 52 U.S.C. 30125(a), which bans them and their officers from directing, transferring, etc. such funds to all;

- BCRA's ban on federal candidates or officeholders from soliciting nonfederal funds for, or directing them to, anyone "in connection with an election for Federal office, including funds for any Federal election activity, unless the funds are subject to the limitations, prohibitions, and reporting requirements of [FECA]," 52 U.S.C. 30125(e)(1);

- BCRA's ban on state and local candidates and officeholders "spending any funds for a [PASO] communication" with nonfederal funds." 52 U.S.C. 30125(f)(1);

- FECA's ban on any contributions by national banks and congressionally authorized corporations "in connection with any election," 52 U.S.C. 30118(a); 11 C.F.R. 114.2(a);

- FECA's ban on federal government contractors making "contribution[s] to any political party, committee, or ... or any political purpose or use." 52 U.S.C. 30119(a); and

- FECA's ban on contributions or donations from foreign nationals "in connection with a

**Verified Complaint** 38

Federal, State, or local election," 52 U.S.C. 30121; *accord* 11 C.F.R. 110.20(b)-(c).

**108.** Federal funds were not, and will not be, used to *raise* nonfederal funds for intended activities, but the nonfederal funds used were (and will be) compliant with state law and non-challenged, applicable provisions of federal law as set out in the preceding paragraph.

**109.** In Count II, LAGOP challenges the Ban and Fundraising Requirement as applied to independent communications from an independent-communications-only account ("ICA"). This ICA would receive only funds (**a**) from *individuals*, (**b**) compliant with state law and the federal restrictions in ¶ 107, and (**c**) either (**i**) transferred from LAGOP (under reasonable accounting methods assuring that subparagraph (b) is met) or (**ii**) fundraised in compliance with provisions governing such fundraising when LAGOP is able to operate an ICA for such independent communications. The ICA's receipts would be limited to Louisiana's contribution limit, currently $100,000 over a 4-calendar-year period (which LAGOP and its ICA must share).

**110.** LAGOP wants to make disbursements of over $5,000 per calendar year for federal election activity in 2015 and 2016, which would require it to report receipts and disbursements for federal election activity, but LAGOP wants to report its nonfederal funds used for such activity as it reports other nonfederal funds absent BCRA's Reporting Requirement (with the exception of the alternative, ICA, as-applied challenge in Count II, which would comply with the Reporting Requirement). The local-committee Plaintiffs want to spend under $5,000 in 2015 and 2016 on federal election activity, so they would not be subject to the Reporting Requirement.

**111.** In 2014, LAGOP wanted to use approximately $100,000 in nonfederal funds for federal election activity, but could not because it did not want to do so under the challenged provisions.

### *I. General*

**112.** None of the federal election activities that Plaintiffs want to do herein would otherwise

qualify as "contributions," or "expenditures," or "exempt activities" and so would not trigger political-committee status for the local-committee Plaintiffs.

**113.** Plaintiffs seek requested relief as soon as possible, given that PASO communications become such immediately; voter-registration activity becomes federal election activity starting November 6, 2015; and voter-identification, voter-registration activity, and get-out-the-vote activity become such starting December 2, 2015. Absent requested relief, Plaintiffs are chilled from exercising First Amendment rights.

**114.** In the future, Plaintiffs intend federal election activities materially similar to those they verify plans to do herein, as legal to do so. Given recurring elections, the time required to resolve such litigation, and the ongoing restrictions, it is likely that situations similar to those described here will recur without opportunity for full litigation. So if this litigation is not concluded before federal-election-activity periods related to 2016 elections end, this case will not be moot because it will be capable of repetition yet evading review. *See, e.g.*, *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 461-63 (2007) ("*WRTL-II*") (Roberts, C.J., joined by Alito, J.) (stating the holding, *Marks v. United States*, 430 U.S. 188, 193 (1977)).

**115.** Plaintiffs face a credible threat of civil enforcement and prosecution if they proceed with planned activities without complying with challenged provisions, absent requested relief.

**116.** Absent requested relief, Plaintiffs will be deprived of their First Amendment rights and suffer irreparable harm. There is no adequate remedy at law.

## Count I
### The Challenged Provisions Are Unconstitutional as Applied to
**(a) Non-Individualized, Independent Communications Exhorting Registering/Voting and (b) Non-Individualized, Independent Communications by Internet.**

**117.** Plaintiffs reallege and incorporate by reference all allegations in preceding paragraphs.

**118. (a)** Plaintiffs challenge the Ban (52 U.S.C. 30125(b)), Fundraising Restriction (52 U.S.C. 30125(c)), and Reporting Requirement (52 U.S.C. 30105(e)(2)) as unconstitutional as applied to *independent, non-individualized communications* that *exhort registering/voting*. "Non-individualized" means "not involv[ing] contacting individuals by telephone, in person, or by other individualized means to assist them in registering to vote" or "in engaging in the act of voting."[16] The communications will be made in substantially similar form to multiple persons and lack "individualized contact for the specific purpose of assisting individuals with the process of registering to vote [or voting]." *See* ¶ 54 (citation omitted). *See* ¶¶ 84-93 (intended examples).

**119. (b)** Plaintiffs *also* challenge these provisions as applied to such communications, and other non-individualized, independent communications constituting federal election activity, *by Internet*.[17] Plaintiffs' own-website postings and emails will be federal election activity because they exhort registering and/or voting, as described in the voter-registration-activity and get-out-the-vote-activity definitions, 11 C.F.R. 100.24(a)(2)(i)(A) and (3)(i)(A), during federal-election-activity periods, and will not fit the "brief and incidental" exception, *see* ¶ 64 (cite and E&J).

**120.** Because the challenged provisions burden core political speech and association (by both contribution and pooling of resources for effective advocacy), which are highly protected by the First Amendment, FEC at a minimum must prove a close "fit" to cognizable governmental interest to justify the requirement under the appropriate level of scrutiny. *See McCutcheon v. FEC*, 134 S.Ct. 1434, 1445 (2014) (controlling plurality opinion) ("[R]egardless whether we apply strict scrutiny or *Buckley*'s 'closely drawn' test, we must assess the fit between the stated governmental objective and the means selected to achieve that objective."). There is no "fit" as applied.

---

[16] This was the original language of FEC's definitions of "voter registration activity" and "get-out-the-vote activity." *See* 2002 E&J, 67 Fed. Reg. at 49110-11. *See supra* ¶¶ 54-55.

[17] Plaintiffs intend no paid communications on another's website, which are not at issue.

**121.** The only cognizable interest that might justify such restrictions on core political speech and association is preventing quid-pro-quo corruption or the appearance of quid-pro-quo corruption. *Citizens United v. FEC*, 558 U.S. 310, 359 (2010). *See also McCutcheon*, 134 S.Ct. at 1450 (controlling opinion). Quid-pro-quo corruption (or its appearance) requires "a direct exchange of an official act for money," *id.* at 1441, which entails "an act akin to bribery," *id.* at 1460 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting), and only "arises when an individual makes large contributions to the candidate or officeholder himself," *id.* at 1460 (plurality).

**122.** Gratitude, access, influence, and leveling playing fields are not corruption or its appearance. *Citizens United*, 558 U.S. at 359-61. "Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption." *McCutcheon*, 134 S.Ct. at 1450.

**123.** As applied to the *communications* at issue here, no quid-pro-quo risk exists. *First*, *exhortations to register and vote* are so lacking in quid-pro-quo risk that FEC excluded them from "voter registration activity" and "get-out-the-vote activity" in 2002 and 2006. *See* ¶¶ 54-55.

**124.** *Second*, even *express-advocacy* independent expenditures "do not give rise to corruption or the appearance of corruption," *Citizens United*, 558 U.S. at 357, due to their independence (making communications possibly even "counterproductive," *Buckley*, 424 U.S. at 47), so *a fortiori* there is no such risk from independent communications merely exhorting registering/voting.

**125.** *Third*, quid-pro-quo corruption (or appearance) requires a "a direct exchange of an official act for money," *McCutcheon*, 134 S.Ct. at 1441 (controlling opinion), only "aris[ing] when an individual makes large contributions to the candidate or officeholder himself," *id.* at 1460, so no anti-corruption interest justifies communications exhorting registering/voting.

**126.** *Fourth*, any derivative anti-circumvention interest must be based on such quid-pro-quo

corruption and direct exchange, so independent communications exhorting registering/voting pose no circumvention risk. FEC said excluding communications exhorting registering/voting from the "voter registration activity" and "get-out-the-vote activity" "will not lead to circumvention." 2006 E&J, 71 Fed. Reg. at 8927. *See also* 2010 E&J, 75 Fed. Reg. at 55259 (same).

**127.** As applied to any non-individualized, independent federal-election-activity communications that are communicated by *Internet*, FEC said Internet activity lacks quid-pro-quo risk:

> [T]here are significant policy reasons to exclude the Internet as a public communication. The Commission fails to see the threat of corruption that is present in a medium that allows almost limitless, inexpensive communication across the broadest possible cross-section of the American population. Unlike media such as television and radio, where the constraints of the medium make access financially prohibitive for the general population, the Internet is by definition a bastion of free political speech, where any individual has access to almost limitless political expression with minimal cost.

2002 E&J, 67 Fed. Reg. at 49072. Given no such threat, the PASO-communications and generic-campaign-activity definitions expressly *exclude* Internet communications by incorporating the "public communication" definition, which excludes Internet communications, unless "placed for a fee on another person's Web site," 11 C.F.R. 100.26. But the voter-registration-activity and get-out-the-vote-activity definitions expressly *include* communications by "e-mail" and "any other means." 11 C.F.R. 100.24(a)(2)(i)(A) and (3)(i)(A) and (B), and the voter-identification definition does not exclude Internet communications, *id.* at 100.24(a)(4). If Internet PASO and generic-campaign-activity communications lack such threat, so does other non-individualized, federal election activity communicated by Internet.

**128.** And as applied to non-individualized, independent communications that *both* exhort registering/voting *and* are communicated by website or email, the challenged provisions are *doubly* unconstitutional because no quid-pro-quo risk arises from *message* or *means*.

**129.** These provisions violate the First Amendment as applied to (**a**) non-individualized, inde-

pendent communications exhorting registering/voting and (**b**) such communications, and other

independent communications constituting federal election activity, communicated by Internet.

## Count II
### Challenged Provisions Are Unconstitutional as Applied to
### (a) Non-Individualized, Independent Communications and
### (b) Such Communications Funded from an Independent-Communications Account.

**130.** Plaintiffs reallege and incorporate by reference all allegations in preceding paragraphs.

**131. (a)** LAGOP challenges the Ban and Fundraising Restriction as applied to *non-individual-ized,*[18] *independent communications*. Such non-express-advocacy communications may occur under several parts of the federal-election-activity definition, including: 11 C.F.R. 100.24(a)(2)(i)(A)-(C) (voter-registration activity), 100.24(a)(3)(i)(A)-(B) (get-out-the-vote activity), and 11 C.F.R. 100.24(a)(4) (voter identification), as well as those definitions requiring "public communications" (100.25), namely,11 C.F.R. 100.24(b)(2)(ii) (generic campaign activity) and 100.24(b)(3) (PASO communications). *See* ¶¶ 84-95, 97-100, 103-05 (examples).

**132. (b)** LAGOP *also* challenges the Ban and Fundraising Restriction as applied to such communications funded from an *independent-communications-only account* ("ICA"). The *ICA* at issue here would contain only contributions from individuals that are legal under state law and applicable federal law (other than the challenged provisions), and would be used only for making the independent communications described above. *See* ¶ 131. Because LAGOP does not challenge the Reporting Requirement under Count II, LAGOP would report the ICA's activity under applicable law, regulations, and FEC instructions when LAGOP is able to do the intended activity absent the challenged provisions. LAGOP plans to establish such an ICA for making such

---

[18] "Non-individualized" communications here are those "not involv[ing] contacting individuals by telephone, in person, or by other individualized means," but by "communications ... in substantially similar form to multiple persons." *See* ¶ 54 (citation omitted).

non-individualized, independent communications as an alternative, if it does not receive the fa-

cial relief requested in Count IV, the relief as to all independent federal election activity re-

quested in Count III, or the relief as to all non-individualized, independent communications re-

quested in Count II(a), ¶ 131.

**133.** Because the challenged provisions burden core political speech and association (by both

contribution and pooling resources for effective advocacy), highly protected by the First Amend-

ment, FEC at a minimum must prove a close "fit" to cognizable governmental interest to justify

the requirement under the appropriate level of scrutiny. *See McCutcheon*, 134 S.Ct. at 1445 (con-

trolling plurality opinion). There is no "fit" as applied.

**134.** The only cognizable interest that might justify such restrictions on core political speech

and association is preventing quid-pro-quo corruption or its appearance. *Citizens United*, 558

U.S. at 359. *See also McCutcheon*, 134 S.Ct. at 1450 (controlling opinion). Quid-pro-quo corrup-

tion (or appearance) requires "a direct exchange of an official act for money," *id.* at 1441, "an act

akin to bribery," *id.* at 1460 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissent-

ing), and only "arises when an individual makes large contributions to the candidate or office-

holder himself," *id.* at 1460 (plurality).

**135.** Gratitude, access, influence, and leveling playing fields are not corruption or its appear-

ance. *Citizens United*, 558 U.S. at 359-61. "Spending large sums of money in connection with

elections, but not in connection with an effort to control the exercise of an officeholder's official

duties, does not give rise to such *quid pro quo* corruption." *McCutcheon*, 134 S.Ct. at 1450.

**136.** As applied to the *non-individualized, independent communications* at issue here (*see*

¶ 131), there is no quid-pro-quo risk. These are, for constitutional purposes, like the independent

expenditures that "do not give rise to corruption or the appearance of corruption," *Citizens*

*United*, 558 U.S. at 357, because "'[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.'" *Id.* (quoting *Buckley*, 424 U.S. at 47). The high protection afforded independent expenditures in *Citizens United* turns on the *independence* of the communications, *id.*, not whether they contain express advocacy. This is clear from *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996) (*"Colorado-I"*), where the Court identified an "independent expenditure," *id.* at 613, though it contained no express advocacy, *see FEC v. Colorado Republican Federal Campaign Committee*, 839 F. Supp. 1488, 1451 (D. Col. 1993) (district court applied express-advocacy construction to relevant provisions and dismissed enforcement proceeding because there was no express advocacy). So protected, non-corrupting "independent expenditures" are constitutionally like the "independent communications" at issue here.

**137.** As applied to such communications *funded from the ICA* at issue here (*see* ¶ 132) there is no quid-pro-quo risk. The ICA would be constitutionally similar to the non-contribution accounts ("NCAs") of nonconnected committees. *See* FEC, *FEC Statement on Carey v. FEC: Reporting Guidance for Political Committees that Maintain a Non-Contribution Account*.[19] Because independent expenditures (like the independent communications here) pose no quid-pro-quo risk, NCAs may solicit *unlimited nonfederal* funds (including corporate and union contributions not involved with the ICA at issue here) for making independent expenditures. NCAs may pay for independent expenditures *entirely* with *nonfederal* funds. In contrast, the ICA at issue here would only solicit contributions from individuals, as allowed by state law (currently $100,000 over a 4-

---

[19] *Available at* http://www.fec.gov/press/press2011/20111006postcarey.shtml.

calendar-year period), *see* ¶ 109, and (as is true with all four Counts) if Plaintiffs prevail they will only be able to use nonfederal funds to pay for an *allocated* amount of their activities under the existing allocation rules, *see* ¶¶ 45-51.

**138.** These provisions violate the First Amendment as applied to (**a**) non-individualized, independent communications and (**b**) such communications from the described ICA.

## Count III
### The Ban, Fundraising Restrictions, and Reporting Requirement
### Are Unconstitutional as Applied to All Independent Federal Election Activity.

**139.** Plaintiffs reallege and incorporate by reference all allegations in preceding paragraphs.

**140.** Plaintiffs challenge the Ban (52 U.S.C. 30125(b)), Fundraising Restriction (52 U.S.C. 30125(c)), and Reporting Requirement (52 U.S.C. 30105(e)(2)) as unconstitutional as applied to *all independent* federal election activities.

**141.** "Federal election activity" sweeps in independent activity. *See* 11 C.F.R. 100.24.

**142.** Because the challenged provisions burden core political speech and association (by both contribution and pooling resources for effective advocacy), highly protected by the First Amendment, FEC at a minimum must prove a close "fit" to cognizable governmental interest to justify the requirement under the appropriate level of scrutiny. *See McCutcheon*, 134 S.Ct. at 1445 (controlling plurality opinion). There is no "fit" as applied.

**143.** The only cognizable interest that might justify such restrictions on core political speech and association is preventing quid-pro-quo corruption or its appearance. *Citizens United*, 558 U.S. at 359. *See also McCutcheon*, 134 S.Ct. at 1450 (controlling opinion). Quid-pro-quo corruption (or its appearance) requires "a direct exchange of an official act for money," *id.* at 1441, "an act akin to bribery," *id.* at 1460 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting), and only "arises when an individual makes large contributions to the candidate or of-

ficeholder himself," *id.* at 1460 (plurality).

**144.** Gratitude, access, influence, and leveling playing fields are not corruption or its appearance. *Citizens United*, 558 U.S. at 359-61. "Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption." *McCutcheon*, 134 S.Ct. at 1450.

**145.** The Ban, Fundraising Requirement, and Reporting Requirement must be justified as to each of the different types of federal election activity by a cognizable interest. There is no quid-pro-quo risk due to the independence of the activities.

**146.** For example, if the independent federal election activity involves communications, such communications are like the independent expenditures that "do not give rise to corruption or the appearance of corruption," *Citizens United*, 558 U.S. at 357, because "'[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.'" *Id.* (quoting *Buckley*, 424 U.S. at 47).

**147.** For example, if a state-committee employee works 26% of her salaried time in a month on federal election activities, then the state committee must pay 100% of her salary from federal funds (instead of the usual allocation between federal and nonfederal funds). But federal election activity encompasses merely soliciting or encouraging registration or voting by Internet communications for which there is no cognizable quid-pro-quo risk. So triggering the 100% federal-funds mandate based on 26% of such activity is unjustified. Nor would there be any such risk in other independent federal election activity, including other aspects of voter-registration and get-out-the-vote activity, or voter-identification, or generic campaign activity, or PASO communica-

tions. Only if these activities fit within a coordination definition might they arguably pose quid-pro-quo risk, but their independence removes such risk.

**148.** An informational interest is inadequate to support the Reporting Requirement, because the foundational justification for regulating federal election activity was a theory of corruption (or its appearance), based on gratitude and access, which was rejected in *Citizens United* and *McCutcheon* (in both expenditure and contribution contexts), so such regulation is now unfounded for that reason and because the independence of the activities at issue means that they may not benefit a candidate and may actually be counterproductive.

**149.** These provisions violate the First Amendment as applied to all independent federal election activity.

## Count IV
### The Ban, Fundraising Restriction, and Reporting Requirements
### Are Unconstitutional Facially.

**150.** Plaintiffs reallege and incorporate by reference all allegations in preceding paragraphs.

**151.** Plaintiffs challenge the Ban (52 U.S.C. 30125(b)), Fundraising Restriction (52 U.S.C. 30125(c)), and Reporting Requirement (52 U.S.C. 30105(e)(2)) as unconstitutional facially because there was never any proven quid-pro-quo corruption (or its appearance) supporting the regulation of federal election activity in the record of *McConnell*, 540 U.S. 93. *McConnell* upheld these provisions on their face though *McConnell* defendants "identified not a single discrete instance of *quid pro quo* corruption attributable to the donation of non-federal funds to the national party committees." *McConnell*, 251 F. Supp. 2d at 395 (opinion of Henderson, J.). *Accord McCutcheon*, 134 S.Ct. at 1469-70 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, dissenting) (quoting and citing *McConnell*, 251 F. Supp. 2d at 395 (opinion of Henderson, J.)). But the Supreme Court requires evidence of quid-pro-quo corruption (or its appearance) to uphold

such restrictions. *Citizens United*, 558 U.S. at 359-60; *McCutcheon*, 134 S.Ct. at 1450-51 (controlling plurality opinion). So no cognizable interest justifies the challenged provisions.

**152.** These provisions facially violate the First Amendment absent any cognizable governmental interest.

## Prayer for Relief

Wherefore, Plaintiffs pray for the following relief:

**1.** Convening of a three-judge court to consider this "action ... brought for declaratory or injunctive relief to challenge the constitutionality of any provision of [BCRA] or any amendment made by [BCRA]," BCRA § 403(a), 116 Stat. at 113-14, under BCRA § 403, Local Civil Rule 9.1, and pertinent law, as soon as practical.

**2.** "[A]dvance[ment] on the docket and ... expedit[ion] to the greatest possible extent the disposition of this action ...." BCRA § 403(a)(4) and (d)(2).

**3.** As requested in **Count I**, declaratory judgments that the Ban (52 U.S.C. 30125(b)), Fundraising Restriction (52 U.S.C. 30125(c)), and Reporting Requirement (52 U.S.C. 30105(e)(2)) are unconstitutional as applied to (**a**) non-individualized, independent communications exhorting registering/voting and (**b**) such communications, and other non-individualized, independent federal-election-activity communications, by Internet;

**4.** Preliminary and permanent injunctions enjoining FEC from enforcing the challenged provisions as described in the prior paragraph.

**5.** As requested in **Count II**, a declaratory judgment that the Ban (52 U.S.C. 30125(b)) and Fundraising Restriction (52 U.S.C. 30125(c)) are unconstitutional as applied to (**a**) non-individualized, independent communications and/or (alternatively) (**b**) as applied to such communications from an independent-communications-only account (ICA) containing only contributions

from individuals where such contributions are lawful under state law and applicable federal law, as described herein.

**6.** Preliminary and permanent injunctions enjoining FEC from enforcing the challenged provisions as described in the prior paragraph;

**7.** As requested in **Count III**, a declaratory judgment that the Ban (52 U.S.C. 30125(b)), Fundraising Restriction (52 U.S.C. 30125(c)), and Reporting Requirement (52 U.S.C. 30105(e)(2)) are unconstitutional as applied to all independent federal election activity;

**8.** Preliminary and permanent injunctions enjoining FEC from enforcing the provisions as described in the prior paragraph;

**9.** As requested in **Count IV**, a declaratory judgment that the Ban (52 U.S.C. 30125(b)), Fundraising Restriction (52 U.S.C. 30125(c)), and Reporting Requirement (52 U.S.C. 30105(e)(2)) are facially unconstitutional.

**10.** Preliminary and permanent injunctions against enforcement of these provisions as described in the prior paragraph.

**11.**  Costs and attorneys fees pursuant to any applicable statute or authority.

**12.** Any other relief that this Court in its discretion deems just and appropriate.

Respectfully submitted,

 /s/ James Bopp, Jr.
James Bopp, Jr., DC Bar #CO 0041
jboppjr@aol.com
Richard E. Coleson*
rcoleson@bopplaw.com
Randy Elf*
relf@bopplaw.com
THE BOPP LAW FIRM, PC
1 South Sixth Street
Terre Haute, IN 47807-3510

**Verified Complaint**                 51

812/232-2434 telephone
812/235-3685 facsimile
*Counsel for Plaintiffs*

*Pro Hac Vice Application To Be Filed

**Verified Complaint**

## Verification

I, Roger Villere, Jr., declare as follows:

1. I am a Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of Louisiana. I am eligible to vote in an election for the office of the President of the United States. I am Chairman of the Republican Party of Louisiana ("LAGOP").

2. I have personal knowledge of LAGOP, the Jefferson Parish Republican Parish Executive Committee ("JPGOP"), and the Orleans Parish Republican Executive Committee ("OPGOP"), their activities, and their intentions, including those set out in the foregoing *Verified Complaint for Declaratory and Injunctive Relief*, and if called on to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Complaint* concerning LAGOP, JPGOP, OPGOP, their activities, and their intentions are true and correct. 28 U.S.C. 1746.

Executed on _____July 28_____, 2015.

_____
Roger Villere, Jr.

**Verified Complaint**

# Certificate of Service

I certify that the foregoing complaint will be served as soon as the summons is available on the following persons by certified mail, return receipt requested, and that a courtesy copy will be emailed to Kevin Deeley, FEC's Acting Associate General Counsel for Litigation, at kdeeley@fec.gov:

General Counsel
FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463
(202) 694-1650

U.S. Attorney General
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530.

Civil Process Clerk
UNITED STATES ATTORNEY'S OFFICE
501 Third Street, NW
Washington, DC 20530

I further certify that on the same date a copy of the complaint will be sent by first-class mail "to the Clerk of the House of Representatives and the Secretary of the Senate" as required under § 403(a)(2) of the Bipartisan Campaign Reform Act of 2002, 116 Stat. 114, at these addresses:

Clerk of the House of Representatives
U.S. HOUSE OF REPRESENTATIVES
U.S. Capitol, Room H154
Washington, DC 20515-6601

Secretary of the Senate
UNITED STATES SENATE
Washington, DC 20510-6601.

I further hereby certify that on August 3, 2015, I electronically filed the foregoing Complaint with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following (and any other FEC counsel that will appear):

Kevin Deeley, Acting Associate General Counsel for Litigation
Federal Election Commission
999 E Street, NW
Washington, DC 20463
kdeeley@fec.gov.

In addition, a courtesy copy was sent by email to kdeeley@fec.gov on the same date.

/s/ James Bopp, Jr.
James Bopp, Jr., DC Bar #CO 0041

**Verified Complaint**