**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **REPUBLICAN PARTY OF LOUISIANA,** <br> **et al.,** | |
| Plaintiffs, | |
| v. | Case No. 15-cv-01241 (CRC) |
| **FEDERAL ELECTION COMMISSION,** | |
| Defendant. | |

**MEMORANDUM OPINION**

The Federal Election Campaign Act ("FECA") establishes dollar limits on contributions that individuals and certain entities may make to a single federal candidate or political-party committee in a given election cycle.  In 1998, the Senate Committee on Governmental Affairs concluded that certain corporations, labor unions, and wealthy individuals had sought to circumvent FECA's limits on contributions to political parties through so-called "soft money" contributions.  S. Rep. No. 105-167 (1998).  In campaign-finance parlance, "soft money" refers to federally unregulated money contributed to parties for activities intended to influence state or local elections.  To prevent the use of soft money to fund election activity that was ostensibly non-federal but in fact benefited federal candidates, Congress, in the Bipartisan Campaign Reform Act of 2002 ("BCRA"), banned national- and state-party committees from using funds raised in excess of the FECA contribution limits to engage in activity affecting federal elections.  This "federal election activity" includes such conduct as voter registration, voter identification, and get-out-the-vote activities connected to elections with federal candidates on the ballot, as well as public communications that refer to clearly identified federal candidates.

Soon after Congress imposed the soft-money ban, the Supreme Court rejected a facial challenge to its constitutionality in <u>McConnell v. FEC</u>, 540 U.S. 93 (2003).  The ban withstood an

as-applied challenge seven years later in RNC v. FEC ("RNC I"), 698 F. Supp. 2d 150 (D.D.C.

2010), aff'd, 561 U.S. 1040 (2010).  And just last year, the Chief Justice stressed—in his opinion

overturning limits on the aggregate value of contributions an individual can make to multiple

candidates (or parties) in one election cycle—that "[o]ur holding about the constitutionality of the

aggregate limits clearly does not overrule McConnell's holding about 'soft money.'"  McCutcheon

v. FEC, 134 S. Ct. 1434, 1451 n.6 (2014).

Undaunted, Plaintiffs in this case—state and local committees of the Republican Party in

Louisiana—seek yet another bite at the apple.  They have sued the Federal Election Commission

("FEC"), alleging that the soft-money ban and two related BCRA provisions unduly infringe on

their First Amendment free-speech rights.  The laws do so, Plaintiffs contend, by preventing them

from funding so-called "independent" federal election activities—activities not coordinated with a

candidate or campaign—from state-party-committee accounts that are not subject to federal

contribution limitations and administrative requirements.  The ultimate merits of this latest

challenge are not yet before the Court.  At this stage, the Court must decide only whether Plaintiffs

are entitled to have their claims heard by a three-judge district court, whose final rulings on the

merits could be appealed directly to the Supreme Court, under BCRA's special judicial-review

mechanism.  See BCRA § 403.

Close observers of the campaign-finance arena may be experiencing twinges of déjà vu.

Last year, these same plaintiffs, represented by the same counsel, were among those who mounted

similar challenges to the soft-money ban before this Court.  See Rufer v. FEC, 64 F. Supp. 3d 195

(D.D.C. 2014); RNC v. FEC ("RNC II"), No. 14-cv-00853 (D.D.C. Aug. 19, 2014).  This Court

declined to convene a three-judge court to hear those challenges.  While the Court found that the

plaintiffs had presented "substantial, non-frivolous" constitutional claims, it concluded they lacked

standing to bring those claims before a three-judge court because their central alleged injury—being

2

prevented from accepting unlimited contributions to fund "independent" election activity—could

have been redressed only by invalidating the longstanding base party contribution limits in FECA.

Rufer, 64 F. Supp. 3d at 198.  BCRA three-judge courts, however, are empowered to decide only

constitutional challenges to provisions of BCRA itself.  Id.  Having been deprived of a direct ticket

to the Supreme Court, the Rufer and RNC II plaintiffs abandoned their appeal of the Court's ruling,

and at least some of them regrouped to fight another day.

       That day has now come, and the Court is again presented with the same two questions:  Are

Plaintiffs' constitutional claims substantial, and are their alleged injuries redressable by a BCRA

three-judge court?  The Court this time answers yes to both.  As in Rufer and RNC II, Plaintiffs

have presented substantial constitutional claims.  While the Supreme Court has twice upheld

BCRA's soft-money ban, and recently affirmed that it is still intact, its ruling in McCutcheon

created widespread uncertainty over the central question presented here: whether truly independent

campaign expenditures by political parties—if there can be such a thing—pose the type of

corruption risk that the Supreme Court has held is necessary to justify limiting federal election

spending.  Given this uncertainty, Plaintiffs' claims cannot be fairly characterized as "frivolous,"

"obviously without merit," or "so foreclosed by" Supreme Court precedent that there is "no room

for the inference that the question sought to be raised can be the subject of controversy."  Feinberg

v. FDIC, 522 F.2d 1335, 1339 (D.C. Cir. 1975) (quoting Ex parte Poresky, 290 U.S. 30, 32 (1933)).

       But unlike in the prior cases, the Court concludes that Plaintiffs here have standing to

present their claims to a three-judge court.  The core injury alleged by the Rufer and RNC II

plaintiffs could not have been redressed without striking down FECA's base limits, which a BCRA

three-judge court may not do.  Assiduously avoiding a frontal assault on the base limits, Plaintiffs

here re-characterize their injury as simply being prevented from spending funds from state-party-

committee accounts on federal election activity, without regard to the FECA base limits.  Make no

mistake, a ruling for Plaintiffs on the merits would render largely meaningless FECA's limits on contributions to state- and local-party committees:  Depending on the contribution limits in the relevant state, if any, an individual or corporation would be able to contribute sums in excess of the existing FECA-imposed federal limits to a state party, and the party could then deposit those funds in a state account and use them to engage in "independent" federal election activity on a scale that would be impossible under existing law.  Plaintiffs have nevertheless established standing because, technically speaking, the relief they seek can be achieved by invalidating BCRA's soft-money ban while leaving FECA's base limits in place.  Clever indeed, but not too clever by half as the FEC suggests.  The Court will, accordingly, grant Plaintiffs' motion to convene a three-judge district court to hear their claims as required by BCRA § 403.

> I.      **Background**

>> A.      <u>Statutory Scheme</u>

As the Court has previously explained, <u>see</u> <u>Rufer</u>, 64 F. Supp. 3d at 199–200, Congress amended FECA in 1976 to establish monetary ceilings on contributions to political-party committees intended to influence federal elections.  Federal Election Campaign Act Amendments of 1976, Pub. L. No. 94–283, § 112, 90 Stat. 487 (codified at 52 U.S.C. § 30116).  These amendments prohibited contributions to "political committees established and maintained by a national political party . . . which, in the aggregate, exceed $20,000; or . . . to any other political committee . . . which, in the aggregate, exceed $5,000."  <u>Id.</u>  In ensuing campaign cycles, certain corporations, labor unions, and wealthy individuals sought to bypass these contribution limits by making so-called "soft money" contributions to political parties—contributions ostensibly earmarked for state and local elections or "issue advertising" and thus not subject to the same legal requirements as contributions explicitly intended to influence federal elections.  <u>McConnell</u>, 540 U.S. at 122–26.  In 2002, Congress responded to this circumvention of FECA's contribution limits

by enacting BCRA, a sweeping series of amendments to FECA which, among other things, limited soft-money contributions to political parties.  Id.

Rather than specifically defining and prohibiting soft-money contributions, BCRA imposed a general ban on certain entities involved in federal elections from collecting funds in excess of FECA's base contribution ceilings.  BCRA § 101, codified at 52 U.S.C § 30125, added a new section to FECA (section 323) prohibiting national-, state-, and local-party committees from soliciting, receiving, spending, or disbursing money not raised in compliance with the base contribution limits.  BCRA also amended the overall base limits by capping individual contributions to state-party committees at $10,000, and by increasing FECA's contribution limit for national parties to $25,000 and pegging that limit to inflation.  BCRA §§ 102(3), 307(a)(2).

FECA contains a special judicial-review mechanism that requires a district court to "certify all questions of constitutionality of the Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc" if the challenge is brought by "the national committee of any political party, or any individual eligible to vote in any election for the office of President."  52 U.S.C. § 30110.  Rather than incorporate FECA's preexisting judicial-review procedure into BCRA, Congress required that constitutional challenges to any "provision of" or "amendment made by" BCRA be heard by a three-judge district court.  See BCRA § 403(a)(3). To expedite Supreme Court review of the constitutionality of the new statute, Congress provided that decisions of the three-judge court may be appealed directly to the Supreme Court.  Id.

B.    Plaintiffs' Challenge

Plaintiffs in this action are the Republican Party of Louisiana ("state-party plaintiff") and the Jefferson Parish and Orleans Parish Republican Party Executive Committees ("local-party plaintiffs").  They seek to use nonfederal funds to engage in a wide variety of non-coordinated

5

"federal election activity,"[1] including conducting mass mailings exhorting voter registration and voting; performing voter identification; undertaking other generic campaign activity; and paying some portion of the salaries of employees who spend a significant amount of their time on federal election activity.  Verified Compl. ¶¶ 84–106.  Plaintiffs ask the Court to invalidate three BCRA provisions that they contend stand in the way.

(1) the *Ban*, BCRA § 101(a), which prohibits "state, district, [and] local committees" from using nonfederal funds for federal election activity and is codified at 52 U.S.C. 30125(b)(1);

(2) the *Fundraising Requirement*, BCRA § 101(a), which requires state and local committees to pay "direct costs," 11 C.F.R. 300.32(a)(3), of fundraising activity for funds used for federal election activity and is codified at 52 U.S.C. 30125(c); and

(3) the *Reporting Requirement*, BCRA § 103(a), which requires monthly reporting by "political committees" of federal election activity, including identifying information

---

[1] Congress has defined "federal election activity" as

(i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;

(ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot);

(iii) a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or

(iv) services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

52 U.S.C. § 30101(20)(A).

on disbursements/receipts for "person[s] aggregating in excess of $200 for any calendar year," 52 U.S.C. 30104(e).

Id. ¶ 32, 34, 35.  They challenge these provisions as unconstitutional under the First Amendment (1) as applied to (a) non-individualized, independent communications exhorting registering to vote and voting and (b) non-individualized, independent communications by Internet; (2) as applied to (a) non-individualized, independent communications and (b) such communications made from a so-called independent-communications-only account ("ICA"); (3) as applied to all independent federal election activity; and (4) facially.  Verified Compl. ¶ 1.

While Plaintiffs do not directly challenge the base contribution limits established by FECA, the clear effect, if not purpose, of a successful challenge would be to enable circumvention of those limits.  Indeed, the remedy Plaintiffs seek would effectively eviscerate the limits.  After all, if a state or local party is free to spend (potentially unlimited) funds from its nonfederal account on federal election activity, then what purpose would limits on contributions to federal accounts serve?  If the provisions of BCRA to which Plaintiffs object are struck down, Plaintiffs will be free to raise and spend tens of thousands of dollars more through their nonfederal accounts than they would be able to through federal accounts subject to FECA's limits.  In Louisiana, for example, a state party may accept up to $100,000 over four years from a single individual, Verified Compl. ¶ 109, well above the $10,000 a state party may receive annually from an individual for purposes of spending on federal election activity.  If an individual were to contribute the maximum amount allowed under state law to the Republican Party of Louisiana over a four-year cycle, and Plaintiffs' BCRA challenge is successful, the state party could spend $60,000 more on federal election activity as a result of that donor's contributions than it could as the law stands today.  And in a state with no contribution limits whatsoever for state parties, striking down the provisions of BCRA that

Plaintiffs challenge would allow for unlimited contributions to a state party for the purpose of conducting federal election activity.

Plaintiffs request that this Court convene a three-judge court to adjudicate their challenges pursuant to BCRA § 403. They have also filed a motion to expedite this action. The FEC seeks discovery, to which Plaintiffs have agreed to a limited extent. The Court held a hearing on Plaintiffs' three-judge-court application and the motion to expedite on October 27, 2015.

C.    Relevant Case Law

As the Court observed in Rufer, "this case sits at the confluence of two currents of First Amendment jurisprudence concerning federal campaign finance." 64 F. Supp. 3d at 200. The first establishes that Congress may, consistent with the First Amendment, limit contributions to federal candidates and their parties in order to curb the risk and appearance of corruption in the legislative process. See McCutcheon, 134 S. Ct. at 1451 n.6 (noting that the "base [contribution] limits remain the primary means of regulating campaign contributions"); McConnell, 540 U.S. at 154–55 (affirming the constitutionality of contribution limits to political parties and observing that due to "the close relationship between federal officeholders and the national parties, . . . large soft-money contributions are likely to create actual or apparent indebtedness on the part of federal officeholders, regardless of how those funds are ultimately used"); Buckely v. Valeo, 424 U.S. 1, 96 (1976) (upholding the constitutionality of FECA's base contribution limits); see also RNC I, 698 F. Supp. 2d at 152 ("Congress may impose some limits on contributions to federal candidates and political parties because of the quid pro quo corruption or appearance of quid pro quo corruption that can be associated with such contributions."). The FEC argues that this line of cases squarely forecloses Plaintiffs' challenge to the soft-money ban, which was meant to do precisely that: curb the risk and appearance of corruption in the legislative process.

The second jurisprudential current establishes that the risk of corruption arising from contributions to candidates and parties dissipates when the recipient of the donation is distinct from a candidate or party.  Cases applying this principle hold that the First Amendment forbids Congress from limiting contributions to and expenditures by political action committees and other "independent" entities whose campaign spending is not coordinated with candidates or parties.  See Citizens United v. FEC, 558 U.S. 310, 357 (2010) (concluding that "independent expenditures . . . do not give rise to corruption or the appearance of corruption," and thus independent-expenditure-only organizations cannot be subject to any contribution limits under the First Amendment); see also Colo. Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 618 (1996) (holding that political parties may make unlimited independent expenditures using contributions subject to FECA's limits); Buckley, 424 U.S. at 47 ("The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.").  Plaintiffs argue that these holdings should apply equally to independent spending by party committees, notwithstanding their close relationship to candidates.  What's sauce for the PAC geese, they submit, should be sauce for the party ganders.

## II.    Analysis

### A.    Jurisdiction

As noted above, the Court's role at this stage of the proceedings is to determine how and by whom this case will be heard.  Plaintiffs have applied for the appointment of a three-judge district court to adjudicate the constitutionality of the challenged BCRA provisions.  See Pls.' Appl. for Three-Judge Court 1 (citing BCRA § 403(a), (d)(2) (allowing plaintiffs to challenge the constitutionality of BCRA provisions before a three-judge district court convened pursuant to 28 U.S.C. § 2284)).  BCRA's judicial-review provision appears straightforward.  It states simply, in

mandatory language, that a constitutional challenge to BCRA "shall," if the plaintiff so chooses, be heard by a three-judge court in the United States District Court for the District of Columbia.  Not just any constitutional challenge needs to be heard by a three-judge court, however.

To qualify for a three-judge court, a case must present a "'substantial claim' and 'justiciable controversy.'"  Schonberg v. FEC, 792 F. Supp. 2d 14, 17 (D.D.C.2011) (quoting Feinberg, 522 F.2d at 1338).[2]  Plaintiffs' claims should not proceed to a three-judge court if they are "'obviously without merit,' or if their 'unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.'"  Feinberg, 522 F.2d at 1338 (quoting Ex parte Poresky, 290 U.S. at 32).  Similarly, Plaintiffs' claims should not be heard by a three-judge court if Plaintiffs lack standing.  See Nixon v. Richey, 513 F.2d 430, 446 n.129 (D.C. Cir. 1975) ("In Gonzalez v. Automatic Employees Credit Union, 419 U.S. 90, 95 (1974), the [Supreme] Court noted that a single judge could dismiss a constitutional challenge for lack of standing without asking for a three-judge court . . . .").  With these standards in mind, the Court turns first to the question of whether Plaintiffs have standing and whether a three-judge court in particular could redress their alleged harm.

---

[2] It bears mention that the Supreme Court may soon clarify the standard for "determin[ing] that a complaint covered by 28 U.S.C. § 2284 is insubstantial[] and that three judges are therefore not required."  See 14-990 Shapiro v. McManus, U.S. Supreme Court (June 8, 2015), http://www.supremecourt.gov/qp/14-00990qp.pdf.  Should the Supreme Court's forthcoming ruling in Shapiro v. McManus alter this Court's analysis of whether Plaintiffs' claims are constitutionally insubstantial, the three-judge court convened to hear Plaintiffs' challenge will retain and may exercise the authority to dissolve itself—an order that would be appealable not directly to the Supreme Court, but instead to the U.S. Court of Appeals for the D.C. Circuit.  See Gonzalez v. Automatic Emp. Credit Union, 419 U.S. 90, 99–101 (1974).

1.    <u>Standing</u>

This Court may properly dismiss Plaintiffs' claims without convening a three-judge court if Plaintiffs lack standing to bring those claims.  To have standing, "the plaintiff[s] must have suffered an 'injury in fact'—an invasion of a legally protected interest"—which is concrete and particularized and is actual or imminent.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). In addition, "there must be a causal connection between the injury and the conduct complained of." <u>Id.</u> (quoting <u>Simon v. E. Ky. Rights Org.</u>, 426 U.S. 26, 41–42 (1976)).  Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  <u>Id.</u> (quoting <u>Simon</u>, 426 U.S. at 38, 43, 96).

a.    <u>Injury</u>

The Court's analysis begins with Plaintiffs' alleged injury.  Although the allegations in Plaintiffs' verified complaint are far from crystal clear on this point, Plaintiffs appear to claim that their injury derives from being forced to spend only federal funds, contained in a federal account and subject to federal regulations, on federal election activity.  Verified Compl. ¶ 75.  The state-party plaintiff explains that "its ability to do desired federal election activity is burdened by the inability to allocate costs to nonfederal funds as allowed before BCRA, and [that] it cannot do some desired federal election activity due to this inability."  <u>Id.</u>  The local-party plaintiffs claim that they are injured by "the complexity and burden of compliance, including creating a federal account to fund [federal election] activity," which restricts—or at least encumbers—their ability to engage in election-related speech.  <u>Id.</u> ¶ 76.

Thus, for the state-party plaintiff to continue to conduct its desired federal election activity, it is forced to maintain a federal account and to comply with the regulations and reporting requirements that accompany such an account.  Similarly, for the local-party plaintiffs to conduct their desired federal election activity—at least the amount of activity they seek to fund—they would

be forced to open a federal account and to comply with the accompanying regulations and reporting requirements.  Because BCRA forces Plaintiffs to channel funding for most federal election activity through federal accounts, which they allege to be a relatively burdensome alternative to funding such activity through existing nonfederal accounts, Plaintiffs have identified an injury—a restriction on their speech—that suffices to establish constitutional standing.  See Citizens United, 558 U.S. at 337–38 (observing, for example, that "the option to form [federal political action committees] does not alleviate the First Amendment problems with [a ban on corporate electoral advocacy]" because "PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations").

The FEC nonetheless contends that Plaintiffs' injury is partly self-inflicted because they have the option of using a special type of nonfederal funds, known as "Levin funds," to conduct some of their intended federal election activity.  Defs.' Opp'n 7.  The Supreme Court described "Levin funds" in McConnell:

> A refinement on the pre-BCRA regime that permitted parties to pay for certain activities with a mix of federal and nonfederal funds, the Levin Amendment allows state and local party committees to pay for certain types of federal election activity with an allocated ratio of hard money and "Levin funds"—that is, funds raised within an annual limit of $10,000 per person. 2 U.S.C. § 441i(b)(2). Except for the $10,000 cap and certain related restrictions to prevent circumvention of that limit, § 323(b)(2) leaves regulation of such contributions to the States.

540 U.S. 93, 162–63 (2003).  In addition, "corporations and unions that are restricted from contributing under federal law can provide Levin funds."  Defs.' Opp'n 7.  As the FEC acknowledges, however, Plaintiffs could use Levin funds to conduct only "*some* of their desired activities," because those "funds may only be used to fund certain activities falling within the first two categories of federal election activity: (1) voter registration activity in the run up to a federal election, and (2) voter identification, get-out-the-vote, and certain generic campaign activity." Id. at 7–8, 18–19 (citing 52 U.S.C. § 30125(b)(2)(A)).  Plaintiffs seek to engage in *additional* federal

election activity, including paying a portion of the salaries of employees who spend more than 25% of their compensated time in a given month on federal election activities, Verified Compl. ¶ 106, payments which the FEC appears to agree Plaintiffs could not make using Levin funds, Defs.' Opp'n 8 (citing 52 U.S.C. § 30125(b)(2)(B)(i)).

The FEC's argument also misses a broader point:  At least part of Plaintiffs' alleged injury stems not from an inability to raise enough federal funds to conduct their desired level of federal election activity, but from being forced—in order to conduct that amount of activity—to maintain or establish federal accounts and to comply with a host of federal regulations governing the use of federal funds.  Plaintiffs claim they do not use Levin funds for the same reason they seek to avoid conducting federal election activity through funds raised and spent from federal accounts: the accompanying "complexity, burdens, and restrictions."  Verified Compl. 5 n.4; see also Pls.' Reply 21 n.22 ("Levin funds require extensive recordkeeping and are limited in how they may be raised, how much may be raised, and how they may be used—they cannot be used, inter alia, for the sort of broadcast activities Plaintiffs wish to do and for any [federal election activity] identifying a federal candidate.").  The theoretical availability of Levin funds, therefore, does not ameliorate this aspect of Plaintiffs' claimed injury.

### b.  Causation

Plaintiffs have also established causation.  Although the FEC contended at oral argument that FECA, not BCRA, imposes the regulations and reporting requirements of which Plaintiffs complain, it is BCRA that requires state and local parties that wish to conduct federal election activity to do so only with "funds subject to the limitations, prohibitions, and reporting requirements of th[e] Act."  52 U.S.C. § 30125.  BCRA is the reason why Plaintiffs may not expend their nonfederal funds, in nonfederal accounts and not subject to federal regulation, on their desired

federal election activity.  Thus, the challenged provisions of BCRA here are the cause of Plaintiffs'
purported injury.

c.   <u>Redressability</u>

The FEC does not contest that Plaintiffs' alleged injuries could be redressed by a favorable
decision in an appropriate judicial forum.  Rather, as in <u>Rufer</u> and <u>RNC II</u>, the FEC contends that a
*three-judge court* could not redress Plaintiffs' alleged injuries.  The Court agrees that a three-judge
court would be unable to provide Plaintiffs the relief they seek if what they sought was to invalidate
the base contribution limits put in place by FECA.  <u>See</u> <u>Rufer</u>, 64 F. Supp. 3d at 204 ("A three-
judge BCRA court 'has no power to adjudicate a challenge to the [base] FECA limits.'" (quoting
<u>McConnell</u>, 540 U.S. at 229)).  But in contrast to the challenge brought in <u>Rufer</u> and <u>RNC II</u>,
Plaintiffs here do not seek, directly at least, the invalidation of FECA's base contribution limits.
Plaintiffs instead challenge the provisions of BCRA that stand in the way of their using nonfederal
funds, contained in nonfederal accounts, to fund significant amounts of federal election activity.
They want to be able to spend freely from those nonfederal funds on that federal election activity.
And a three-judge BCRA court could indeed allow Plaintiffs to do just that without having to
invalidate FECA's base contribution limits.

Issuing a ruling that has the effect of rendering FECA's base contribution limits meaningless
is not the same thing as issuing one that strikes down those limits.  While a three-judge court is
powerless to do the latter, nothing prevents it from doing the former.  Therefore, there is no
redressability bar to Plaintiffs' attempt to have their case heard before a three-judge court convened
pursuant to BCRA's judicial-review provision.

2.      <u>Substantiality</u>

Plaintiffs' constitutional claims need not proceed to a three-judge court if they are
insubstantial.  A constitutional claim is insubstantial if it is obviously devoid of merit or if

14

precedent unquestionably forecloses the subject of the claim and leaves no room for suggesting that the question raised can be the subject of controversy. Feinberg, 522 F.2d at 1338; see also Goosby v. Osser, 409 U.S. 512, 518 (1973) ("'Constitutional insubstantiality' for this purpose has been equated with such concepts as 'essentially fictitious,' Bailey v. Patterson, 369 U.S. at 33, 'wholly insubstantial,' ibid.; 'obviously frivolous,' Hannis Distilling Co. v. Baltimore, 216 U.S. 285, 288 (1910); and 'obviously without merit,' Ex parte Poresky, 290 U.S. 30, 32 (1933)."). While this standard may sound simple to apply, the "determination of substantiality is rarely mechanical," and "[i]n many cases . . . , there may be considerable room for argument over whether particular constitutional claims are so frivolous, or so foreclosed by prior decisions, as to be too insubstantial for jurisdiction." Feinberg, 522 F.2d at 1339. This is indeed such a case.

As noted previously, both McConnell and RNC I upheld the constitutionality of the same provisions of BCRA that Plaintiffs challenge here, which are now codified at 52 U.S.C. § 30125. McConnell upheld these provisions against a facial challenge, 540 U.S. at 161–73, and RNC I upheld them against an as-applied challenge, 698 F. Supp. 2d at 160–62. Plaintiffs contend that their argument—that the First Amendment allows for unlimited state-party spending on *independent* federal election activity—is distinguishable from the argument advanced by the plaintiffs in RNC I—that state-party spending cannot be limited as to election activity that is not sufficiently federal in nature. The state-party plaintiffs in RNC I, however, sought to conduct activity very similar to that which plaintiffs wish to conduct here. Compare 698 F. Supp. 2d at 156 (noting that plaintiffs wished to "engage in voter registration, voter identification, get-out-the-vote activities, and 'generic campaign activity' . . . in connection with elections where both state and federal candidates appear on the ballot"), with Verified Compl. ¶¶ 74–111. Given the similarities, the FEC urges that Plaintiffs' case is plainly foreclosed by the two prior cases, rendering their claims constitutionally insubstantial. Defs.' Opp'n 32. The Court is inclined to agree with the FEC

that McConnell and RNC I appear to control any district court's resolution of this case. Nevertheless, given subsequent statements by the Supreme Court and the relatively low bar that Plaintiffs must clear to demonstrate that their claims are substantial, the Court finds, as it did in Rufer and RNC II, that Plaintiffs have met their burden.

The crucial development since the Supreme Court upheld the soft-money ban in RNC I is its decision in McCutcheon, in particular its discussion of the type of corruption risk that is necessary to justify limiting political contributions. A plurality of the Court held in McCutcheon "that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. 'Ingratiation and access . . . are not corruption.'" McCutcheon, 134 S. Ct. at 1441 (plurality opinion) (ellipses in original) (quoting Citizens United, 558 U.S. at 360). Rather, "[a]ny regulation must instead target what we have called 'quid pro quo' corruption or its appearance." Id. The Court explained:

> Of course a candidate would be pleased with a donor who contributed not only to the candidate himself, but also to other candidates from the same party, to party committees, and to PACs supporting the party. But there is a clear, administrable line between money beyond the base limits funneled in an identifiable way to a candidate—for which the candidate feels obligated—and money within the base limits given widely to a candidate's party—for which the candidate, like all other members of the party, feels grateful.
>
> When donors furnish widely distributed support within all applicable base limits, all members of the party or supporters of the cause may benefit, and the leaders of the party or cause may feel particular gratitude. That gratitude stems from the basic nature of the party system, in which party members join together to further common political beliefs, and citizens can choose to support a party because they share some, most, or all of those beliefs. See Tashjian v. Republican Party of Conn., 479 U.S. 208, 214–216 (1986). To recast such shared interest, standing alone, as an opportunity for quid pro quo corruption would dramatically expand government regulation of the political process.

Id. at 1461.

To be sure, the Chief Justice's opinion in McCutcheon was careful "not [to] address the base limits" so as not to "silently overrule[] the Court's holding in McConnell," and to emphasize that its

16

"holding about the constitutionality of the aggregate limits clearly does not overrule McConnell's holding about 'soft money.'" Id. at 1451 n.6 (plurality opinion). Yet one cannot help but question how the Court's definition of corruption in McCutcheon squares with its holding on the soft-money ban in McConnell.

Indeed, Justice Breyer voiced this uncertainty in his dissent for four Justices, arguing that the Court's definition of 'corruption' in McCutcheon, which was central to its holding in that case, is "virtually impossible to reconcile with [the] Court's decision in McConnell, upholding the Bipartisan Campaign Reform Act." Id. at 1466 (Breyer, J., dissenting). The dissent further explained that McCutcheon may have changed the law in a way that the Supreme Court's earlier decision in Citizens United, which predated the Court's affirmance of the soft-money ban in RNC I, did not:

> The plurality's use of Citizens United's narrow definition of corruption here, however, is a different matter. That use does not come accompanied with a limiting context (independent expenditures by corporations and unions) or limiting language [as it did in Citizens United]. It applies to the whole of campaign finance regulation. And, as I have pointed out, it is flatly inconsistent with the broader definition of corruption upon which McConnell's holding depends.

Id.; see also id. ("Does the Court intend today to overrule McConnell? Or does it intend to leave McConnell and BCRA in place? The plurality says the latter. . . . But how does the plurality explain its rejection of the broader definition of corruption, upon which McConnell's holding depends?").

The McCutcheon dissenters are not alone in questioning whether the Court's decision seriously undermines McConnell's soft-money holding. Election-law scholars and practitioners have also opined that the BCRA provisions challenged here may find themselves on shaky constitutional ground after McCutcheon. See, e.g., Richard L. Hasen, Op-Ed: The McCain-Feingold Act May Doom Itself, Nat'l L.J. (Aug. 17, 2015), http://www.nationallawjournal.com/id=1202734808860/OpEd-The-McCainFeingold-Act-May-Doom-Itself?slreturn=20150928113613

17

(noting, following <u>McCutcheon</u>, the "good chance the [Supreme Court] . . . will strike down what remains of McCain-Feingold"); Kimberly Robinson, <u>After 'McCutcheon,' Soft Money Next on Chopping Block?</u>, Bloomberg BNA (Apr. 22, 2014), http://www.bna.com/mccutcheon-soft-money-n17179889763/ ("[A]lthough it is 'technically true' that <u>McCutcheon</u> didn't invalidate restrictions on soft money, the decision 'makes it more likely that the soft money ban will be struck down in a future case.'" (quoting Professor Daniel Tokaji)); <u>Did McCutcheon Save Democracy Or Destroy It?</u>, Politico Magazine (Apr. 2, 2014), http://www.politico.com/magazine/story/2014/04/mccutcheon-save-democracy-or-destroy-it-105327 ("<u>McCutcheon</u> borrows the narrow reading of the government's interest in <u>Citizens United</u> and applies it to enhance the position of political parties in the campaign finance regulatory scheme, contrary to the direction set by <u>McConnell</u>. . . . [T]he doctrine developed in <u>Citizens United</u> for 'independent expenditures' on behalf of candidates has moved the constitutional law as it affects 'contributions' to political parties.  The reach of <u>Citizens United</u> has been extended, and that of <u>McConnell</u> cut back." (quoting former White House Counsel Robert Bauer)).  The zeitgeist in the campaign-finance community thus reflects significant uncertainty as to the state of Section 13205's constitutionality and the continued vitality and scope of <u>McConnell</u>'s soft-money holding.  In light of this uncertainty, it would be somewhat odd to view this new constitutional challenge to BCRA's soft-money provisions as being frivolous, clearly foreclosed, or obviously devoid of merit.

In sum, Plaintiffs' claims raise questions that, while seemingly settled following <u>McConnell</u> and <u>RNC I</u>, may no longer be so settled.  And intervening changes in the law or the legal landscape are properly considered as part of the Court's substantiality inquiry.  <u>See</u> <u>Feinberg</u>, 522 F.2d at 1339.  Given developments since the Supreme Court again upheld the soft-money ban in <u>RNC I</u>, which it decided after <u>Citizens United</u> but before <u>McCutcheon</u>, Plaintiffs' claim—which presents an argument for reconsidering certain holdings in <u>McConnell</u> in light of <u>McCutcheon</u>—does not

appear to be frivolous or to involve a question that has been so settled by precedent as to be beyond controversy. As a result, the Court finds Plaintiffs' claims to be constitutionally substantial for purposes of convening a three-judge district court.

### III.     Conclusion

Because the Court finds that Plaintiffs have advanced substantial constitutional claims and have standing to pursue those claims, it will grant Plaintiffs' motion to convene a three-judge court, request that the Chief Judge of the U.S. Court of Appeals for the D.C. Circuit convene a three-judge court, and adopt the discovery and summary-judgment briefing schedule that the parties propose in their Meet and Confer Statement [Dkt. No. 20]. It will therefore also deny Plaintiffs' motion to expedite as moot. An Order accompanies this Memorandum Opinion.


                                              _____
                                              CHRISTOPHER R. COOPER
                                              United States District Judge

Date:  November 25, 2015