**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **REPUBLICAN PARTY OF LOUISIANA, et al.**, | |
| Plaintiffs, | |
| v. | Case No. 15-cv-01241 (CRC-SS-TSC) |
| **FEDERAL ELECTION COMMISSION**, | |
| Defendant. | |

Before: SRINIVASAN, Circuit Judge; COOPER, District Judge; and CHUTKAN, District Judge.

**MEMORANDUM OPINION**

SRINIVASAN, Circuit Judge:

This case presents the latest First Amendment challenge to campaign-finance regulations enacted by the Bipartisan Campaign Reform Act of 2002, known as BCRA. The BCRA provisions at issue bar state and local political parties from using contributions of so-called soft money for activities affecting federal elections.

We are not the first court to consider First Amendment challenges to BCRA's limits on state and local political parties' use of soft-money donations. The Supreme Court, in *McConnell v. FEC*, 540 U.S. 93 (2003), upheld those measures against a facial challenge under the First Amendment. A prior three-judge district court, relying on *McConnell*, later sustained the provisions against an as-applied challenge, and the Supreme Court summarily affirmed that decision. *Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150 (D.D.C. 2010) (*RNC*), *aff'd*, 561 U.S. 1040 (2010). We see no salient distinction between the First Amendment claims rejected in those cases and the challenge presented here. We therefore grant summary judgment in favor of the Federal Election Commission.

**I.     Background**

A.   Statutory Context

The evolution of federal campaign-finance laws through BCRA has been chronicled in detail elsewhere. *See, e.g.*, *McConnell*, 540 U.S. at 115–34.  Throughout, a central aim of Congress has been to address the appearance or actuality of corruption resulting from large campaign contributions to political parties and candidates.  We briefly review the background of the particular statutory provisions at issue here to set the context for our consideration of the challenges presented in this case.

Congress enacted BCRA to address perceived shortcomings in the framework of campaign-finance laws established under the Federal Election Campaign Act of 1971 (FECA). From the time of FECA, federal law has limited the amount of funds individuals may contribute to political parties (and candidates) in any election cycle.  *See* 52 U.S.C. § 30116(a).  Because the statutory definition of "contribution" confines the term to elections for federal office, *see id.* § 30101(8)(A)(i), FECA's limitations on the amount of contributions by individuals to political parties solely concern federal elections.  Currently, individuals can annually contribute up to $33,400 to any national political party and $10,000 to any state or local political party.  *Id.* § 30116(a)(1), (c); 80 Fed. Reg. 5751, 5752 (2015).

In addition to those ceilings on the amount of contributions by individuals, federal law also has long prohibited contributions altogether (of any amount) from certain funding sources: corporations and labor unions are barred from making any contributions from their general funds to political parties and candidates for federal elections (although those sources can form separate political action committees, which may make contributions).  *See* 52 U.S.C. § 30118.  Together, the ban on contributions from certain sources and the caps on contributions from individuals are referred to as FECA's source and amount limitations.  *E.g.*, *McConnell*, 540 U.S. at 122.

Campaign contributions complying with FECA's source and amount limitations—e.g., funding from individuals in amounts below the statutory caps—can be used by political parties in connection with federal elections, and are known as "federal" or "hard" money. *Id.* at 122. Contributions falling outside FECA's source and amount restrictions—e.g., funding from individuals in excess of the statutory ceilings, or funding from corporations in any amount— cannot be used by political parties for federal elections, and are known as "nonfederal" or "soft" money. *Id.* at 122–23. But what about a political party's activities affecting state or local elections but also inherently influencing federal elections, such as a party's voter-registration or get-out-the-vote efforts or its general issue advertisements? Can a party use nonfederal money for those sorts of initiatives, despite the effect on federal elections?

Before BCRA, the Federal Election Commission (FEC) increasingly allowed the use of soft-money donations for activities affecting both federal and state elections. *Id.* at 123–24. The FEC's blessing spurred a dramatic increase in the raising and use of soft money by national and state political parties (and also by candidates, who urged donors to give soft money to parties after reaching the ceilings on hard-money contributions). *Id.* at 124–25. Donations of soft money often dwarfed contributions of hard money. *Id.* at 124. The upshot was that the "solicitation, transfer, and use of soft money . . . enabled parties and candidates to circumvent FECA's limitations on the source and amount of contributions in connection with federal elections." *Id.* at 126.

Congress enacted BCRA in large measure to "plug the soft-money loophole." *Id.* at 133. First, BCRA took "national parties out of the soft-money business" altogether, *id.*, establishing a wholesale bar against national political parties' raising or using nonfederal money, 52 U.S.C. § 30125(a). Congress additionally understood that the soft-money ban for national parties would have little effect if state and local parties remained free to use nonfederal money for activities

affecting federal elections—donors would then simply route soft-money donations to state and local parties instead of national parties. *See McConnell*, 540 U.S. at 133–34; *RNC*, 698 F. Supp. 2d at 154. Accordingly, Congress, in the provisions directly challenged in this case, restricted the use of soft money by state and local parties.

The centerpiece of those measures is BCRA § 323(b). 52 U.S.C. § 30125(b). That provision generally prohibits state and local political parties from using soft money to engage in "federal election activity" (FEA). *Id.* The obvious effect of the general bar against using soft money for FEA is to require the financing of FEA with federal—i.e., hard—money. (The bar is also subject to exceptions having no bearing on our analysis.) The statute defines FEA to include voter-registration activity that is sufficiently proximate to a federal election; voter identification and get-out-the-vote initiatives for elections in which a federal candidate is on the ballot; public communications referring to a clearly identified candidate for federal office, and promoting, supporting, attacking, or opposing a candidate for that office; and services provided by a state-party employee who spends more than twenty-five percent of her work time on activities in connection with a federal election. *Id.* § 30101(20)(A).

As a corollary to § 323(b)'s general bar against using soft money for FEA, § 323(c) of BCRA prohibits the use of soft money to raise funds for FEA. *Id.* § 30125(c). In addition to those bans on devoting nonfederal funds to FEA, BCRA requires state and local political parties to submit periodic reports documenting their receipts and disbursements of federal funds for FEA if those amounts equal or exceed $5,000 in any year. *Id.* § 30104(e)(2), (e)(4).

### B.   Plaintiffs' Claims

The plaintiffs in this case are various political-party organizations from the state of Louisiana. They include a state political party (the Republican Party of Louisiana) as well as

local party affiliates (the Jefferson Parish and Orleans Parish Republican Party Executive Committees). Plaintiffs desire to undertake a variety of activities constituting FEA.

Plaintiffs challenge the BCRA provisions barring their use of soft money to conduct FEA and to fundraise for FEA (§§ 323(b)–(c)), as well as BCRA's requirement that they report their receipts and disbursements of hard money for FEA. Plaintiffs contend that those measures violate the First Amendment on their face and as applied to specific FEA in which they wish to engage. The common thread linking the range of FEA implicated by plaintiffs' as-applied challenge is that the activity would be "independent," in that, according to plaintiffs, they would conduct the activity without any coordination with a federal candidate or campaign. Plaintiffs argue that the challenged BCRA provisions unconstitutionally burden their First Amendment rights by restricting their ability to use nonfederal money to finance independent communications and other independent activity qualifying as FEA. They state that they have wanted to use soft money for FEA in past and current election cycles and desire to do so in future cycles as well. Ver. Compl. ¶¶ 77, 111–14. For instance, plaintiffs would like to use soft money for independent voter-registration activity and for independent communications supporting or opposing identified candidates for federal office. *Id.* ¶¶ 84–105.

BCRA § 323(b) bars the use of nonfederal funds for that (or any other) type of FEA. While plaintiffs' challenge encompasses not only § 323(b) but also § 323(c)'s associated bar against using soft money to raise funds for FEA, as well as BCRA's reporting requirements for FEA, plaintiffs explain that they "primarily argue against" § 323(b), "because it is central and the other provisions are derivative." Pls.' Mem. Supp. Mot. Summ. J. 37. Plaintiffs thus see the latter provisions as rising or falling with § 323(b). *Id.* at 36–37 n.38.

C. <u>Prior Decisions</u>

Two cases in which the Supreme Court rejected First Amendment challenges to BCRA § 323(b) form the backdrop for our consideration of plaintiffs' claims. First, in *McConnell v. FEC*, 540 U.S. 93, the Court upheld BCRA's restrictions on soft-money contributions to national, state, and local political parties against a facial challenge under the First Amendment. With regard to § 323(b)'s prohibition against state and local parties' use of soft money for FEA, the Court found that "the funding of such activities creates a significant risk of actual and apparent corruption" because FEA "confer[s] substantial benefits on federal candidates." *Id.* at 168. *McConnell* held that the ban on using nonfederal money for FEA was "a reasonable response to that risk"—a measure "closely drawn to meet the sufficiently important governmental interests of avoiding corruption and its appearance." *Id.* at 168–69.

Following *McConnell*, a prior three-judge district court considered an as-applied First Amendment challenge to BCRA's soft-money restrictions, including § 323(b)'s limits on state and local parties' use of soft money for FEA. *RNC*, 698 F. Supp. 2d 150. The state and local political-party plaintiffs in *RNC* claimed a First Amendment entitlement to use soft money to fund activity that, while falling within the statutory definition of FEA, would primarily target state elections and candidates and thus would have only an incidental effect on federal elections. *Id.* at 161. The *RNC* three-judge court rejected that as-applied challenge, finding it incompatible with *McConnell*. The court explained that "nothing in *McConnell* suggests that the question whether a state or local party's communication implicates the federal anti-corruption interest depends on whether the communication is 'targeted' at federal elections." *Id.*

The Supreme Court summarily affirmed the *RNC* court's decision. 561 U.S. 1040. The Court's summary affirmance establishes binding precedent on the precise issues presented to the Court and necessarily resolved by its judgment (including the validity of BCRA § 323(b) against

6

the as-applied challenge presented in the case). *See Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983). We have no occasion to scrutinize the exact extent to which aspects of the three-judge court's decision in *RNC* may have become binding upon us by virtue of the Supreme Court's affirmance. Because we would accept the persuasive force of the *RNC* court's decision in any event, we take up plaintiffs' challenge on the understanding that we will adhere to the analysis set out in *RNC*.

**II.   Analysis**

A.   Standing

Before addressing the merits of plaintiffs' First Amendment claims, we first assure ourselves of plaintiffs' standing to bring their challenges. The FEC has moved for dissolution of the three-judge court for lack of standing, or in the alternative, for an order dismissing the action. Plaintiffs bear the burden to establish their standing to bring this action, including showing that the challenged BCRA provisions cause them concrete injury and that a decision in their favor would redress their injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The FEC's arguments against plaintiffs' standing derive from the particular purposes for which a three-judge court may be convened under BCRA. Plaintiffs applied to convene this court pursuant to BCRA § 403(a). That provision allows for a three-judge court to address challenges to provisions enacted by BCRA, but not measures already in place under FECA. *See McConnell*, 540 U.S. at 229. That limitation on a three-judge court's authority under BCRA § 403(a) has implications for a plaintiff's standing. If a plaintiff's injuries flow from preexisting FECA measures lying beyond the remedial reach of a BCRA three-judge court, the court may lack the ability to redress the plaintiff's injuries, depriving the plaintiff of standing. *See id.*; *Rufer v. FEC*, 64 F. Supp. 3d 194, 203–04 (D.D.C. 2014).

Here, there is little doubt about the existence of standing to challenge BCRA's reporting requirements for FEA of $5,000 or more in any calendar year, 52 U.S.C. § 30104(e)(2). The state-party plaintiff is subject to those reporting obligations, and invalidation of the requirements would alleviate the state party's need to submit monthly reports. *See id.* § 30104(e)(4). That is enough to establish the state party's standing with regard to BCRA's challenged reporting requirements. And because the state party has standing to bring that claim, there is no need to assess whether the local parties also have standing to challenge the same provision—we would reach the merits of the claim regardless. *See Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009).

Plaintiffs' standing to challenge BCRA's limitations on the use of soft money by state and local parties, BCRA §§ 323(b) and 323(c), presents a more involved question. Plaintiffs allege that their desire to conduct additional FEA is burdened by their inability under BCRA to use nonfederal funds for that purpose. *See* Ver. Compl. ¶ 75. We accept that allegation for purposes of determining plaintiffs' standing, *see Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 109 (1979); *Grimes v. D.C.*, 794 F.3d 83, 94 n.5 (2015), and it demonstrates that BCRA's limits on state and local parties' use of soft money cause plaintiffs concrete injury. The FEC submits that plaintiffs nonetheless fail to demonstrate injury because they do not show that they possess (or could raise) additional nonfederal money from individuals that could be devoted to the FEA they desire to conduct. But as the FEC does not dispute, the state-party plaintiff possesses nonfederal funding from corporations, *see* Decl. of Jason Doré Supp. FEC's Mot. Summ. J., Ex. 7, at 114, 116, 118, which presently cannot be used for FEA. The state party's inability to use corporate funds in its possession for additional FEA in which it would like to engage qualifies as a concrete injury.

8

The FEC contends, however, that plaintiffs' inability to spend those corporate contributions on FEA is not an injury redressable by a three-judge court convened under BCRA § 403(a). The FEC observes that, under FECA's preexisting source and amount limitations, political parties could not receive contributions from corporations "in connection with" elections for federal office. 52 U.S.C. § 30118(a). That restriction under FECA, the FEC argues, independently bars plaintiffs' use of corporate contributions. And because a BCRA three-judge court has no authority to invalidate a preexisting FECA measure, the FEC contends, this court lacks the ability to redress plaintiffs' injuries.

The FEC's argument is unpersuasive. It is true that § 30118(a)'s "in connection with" phraseology could be read to encompass each type of statutorily defined FEA. But before BCRA's enactment, the FEC ruled that state and local political parties could use nonfederal money—including funding from corporations—for certain activities affecting both federal and state elections. *See McConnell*, 540 U.S. at 123 & n.7. A primary reason for enacting BCRA was precisely to bring an end to that acknowledged "soft-money loophole." *Id.* at 133. BCRA did so in part by prohibiting state and local parties from using nonfederal funds for FEA, a new constraint that did not exist under FECA. Invalidation of that prohibition would enable plaintiffs to use the corporate funds they have on hand to engage in at least some kinds of FEA, as they would have been able to do under FECA. Consequently, plaintiffs' injury—i.e., their inability under BCRA to use corporate funds in their possession for FEA—is redressable by this court. It follows that plaintiffs have demonstrated standing to bring their First Amendment challenge to BCRA §§ 323(b) and 323(c). We proceed, then, to address the substance of their claims.

  B. <u>The Merits</u>

Both plaintiffs and the FEC have moved for the entry of summary judgment in their respective favors. Summary judgment is appropriate if there are no genuine issues of material

9

fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. We first consider plaintiffs' claim that BCRA § 323(b) and the other challenged provisions are invalid on their face. We then turn to plaintiffs' claim that the provisions are invalid as applied to the particular type of FEA they wish to conduct—i.e., "independent" FEA. As to both the facial and as-applied claims, we conclude—in line with *RNC*—that *McConnell* compels granting summary judgment to the FEC.

1. Facial Challenge

In *McConnell*, the Supreme Court squarely rejected a claim that BCRA § 323(b) is facially invalid under the First Amendment. 540 U.S. at 161–73. In doing so, the Court invoked the longstanding distinction drawn in the Court's decisions between contribution limits and expenditure limits. *Id.* at 134–42. Those decisions "have subjected restrictions on campaign expenditures to closer scrutiny than limits on campaign contributions." *Id.* at 134.

In particular, when a law constrains the extent to which individuals and entities unconnected to a federal campaign can expend funds to engage in their own political advocacy about an election, the expenditure limit must satisfy exacting First Amendment scrutiny. But when a law instead restricts an individual's or entity's contributions to a candidate or political party, the contribution limit is subjected to a "less rigorous degree of scrutiny." *Id.* at 137. That is because "contribution limits, unlike limits on expenditures, entail only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 134–35 (quotation marks and alteration omitted). A contribution limitation still "permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* at 135 (quoting *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (per curiam)). In addition, the more lenient treatment afforded to contribution restrictions

"reflects the importance of the interests that underlie contribution limits"—avoiding the appearance or actuality of corruption. *Id.* at 136.

The *McConnell* Court examined the facial challenge to BCRA § 323(b) under the less rigorous standard of scrutiny applicable to contribution limits. That standard calls for assessing whether the challenged restriction is "closely drawn to match a sufficiently important interest." *Id.* (quotation marks omitted). Applying that standard, the Court upheld § 323(b)'s bar against state and local political parties' use of nonfederal funds for FEA. The Court held that "§ 323(b), on its face, is closely drawn to match the important governmental interests of preventing corruption and the appearance of corruption." *Id.* at 173.

*McConnell*'s holding forecloses plaintiffs' facial challenge to § 323(b). Plaintiffs contend that § 323(b) should be examined under the exacting scrutiny applicable to expenditure limits rather than the less rigorous standard governing contribution limits. It is not our place, however, to second-guess the Supreme Court's treatment of § 323(b) as a contribution restriction instead of an expenditure restriction. The *McConnell* Court in fact specifically considered and rejected the precise argument made by plaintiffs here.

The Court understood that § 323(b) is framed as a bar against state political parties' spending soft money on FEA, not as a barrier to contributing soft money to state parties for FEA. *Id.* at 138. "But for purposes of determining the level of scrutiny," the Court explained, "it is irrelevant that Congress chose in § 323 to regulate contributions on the demand rather than the supply side." *Id.* Section 323(b) does not "in any way limit[] the total amount of money parties can spend"; it "simply limit[s] the source and individual amount of donations." *Id.* at 139. That it does so "by prohibiting the spending of soft money does not render [it an] expenditure limitation[]." *Id.*; *accord RNC*, 698 F. Supp. 2d at 156. The Court accordingly described § 323(b) as "a straightforward contribution regulation." *McConnell*, 540 U.S. at 161.

11

Plaintiffs submit that *McConnell*'s treatment of § 323(b) as a contribution limit has since been "superseded" by the plurality opinion in *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014)—in particular, by the *McCutcheon* plurality's characterization of the contribution ceiling at issue in that case as a restriction of "speech." *See* Pls.' Mem. Supp. Mot. Summ. J. 15; *McCutcheon*, 134 S. Ct. at 1452. We have no warrant, however, to disregard a directly applicable holding of the Supreme Court based on a supposition that a subsequent decision might call into question the viability of the Court's rationale. *E.g.*, *Bosse v. Oklahoma*, No. 15-9173, slip op. at 2 (U.S. Oct. 11, 2016) (per curiam); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). We must instead leave to the Court itself "the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez*, 490 U.S. at 484).

At any rate, the *McCutcheon* plurality's characterization of the contribution limit at issue there as a restriction of speech affords no basis for us to disregard *McConnell*'s holding about the facial validity of § 323(b). The *McCutcheon* plurality expressly said so: it confirmed that, while its decision invalidated FECA's ceiling on the aggregate amount individuals may contribute to candidates and party committees in an election cycle, its "holding about the constitutionality of the aggregate limits clearly does not overrule *McConnell*'s holding about 'soft money.'" 134 S. Ct. at 1451 n.6. Moreover, the approach of the *McCutcheon* plurality is consistent with *McConnell*'s treatment of § 323(b) as a contribution limit subject to less demanding scrutiny. While the *McCutcheon* plurality struck down the aggregate contribution limits at issue as an invalid restriction of speech, *id.* at 1452, the plurality found no reason to depart from the less rigorous standard long applied to contribution restrictions, *see id.* at 1445–46.

*McConnell*, applying the same standard, upheld § 323(b)'s ban on using soft money for FEA against a facial challenge. That holding compels rejecting plaintiffs' facial challenge to the same provision. And while plaintiffs' challenge also extends to § 323(c)'s derivative prohibition

against using nonfederal money to raise funds for FEA, they correctly concede that the validity of that adjunct provision stands or falls with the validity of § 323(b)'s central prohibition. If Congress can validly prohibit the use of soft money for FEA, it can also, as a corollary measure, ban the use of soft money to raise funds for FEA.

That leaves plaintiffs' facial challenge to BCRA's reporting requirements for FEA, 52 U.S.C. § 30104(e)(2). Plaintiffs do not argue that the reporting requirements are facially invalid even if §§ 323(b) and 323(c) are facially valid. Nor could plaintiffs so contend. As a general matter, "disclosure requirements inhibit speech less than do contribution and expenditure limits." *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc). And the Supreme Court has affirmed that disclosure obligations, unlike contribution and expenditure limits, can be justified by governmental interests beyond reducing the risk of actual and apparent corruption, *see id.*, such as the interest in "providing the electorate with information about the sources of election-related spending," *McCutcheon*, 134 S. Ct. at 1459 (plurality opinion) (alteration, quotation marks, and citation omitted). BCRA's reporting requirements for FEA bear the requisite substantial relation to that important objective, *see Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010), and plaintiffs offer no reason to conclude otherwise.

2. As-Applied Challenge

*McConnell*'s rejection of a facial challenge to § 323(b) does not necessarily preclude the possibility of a successful as-applied challenge. But "a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments the Supreme Court expressly considered when rejecting a facial challenge to that provision. Doing so is not so much an as-applied challenge as it is an argument for overruling a precedent." *RNC*, 698 F. Supp. 2d at 157.

Here, plaintiffs' as-applied challenge encompasses a broad range of FEA in which they wish to engage, all of which shares the common feature that it would be conducted independently—i.e., without coordination with any federal candidate or campaign. In plaintiffs' view, § 323(b)'s ban on using soft money for FEA is invalid as applied to state and local parties' independent FEA because independent spending of that kind poses an insufficient risk of actual or apparent corruption.

Plaintiffs' argument is incompatible with *McConnell*'s approach in rejecting the facial challenge to § 323(b). The challengers in *McConnell* contended that § 323(b) encompassed "activities that cannot possibly corrupt or appear to corrupt federal officeholders and thus goes well beyond Congress' concerns about the corruption of the federal electoral process." 540 U.S. at 166. The Court disagreed. It canvassed the full range of activity constituting FEA—from voter-registration initiatives to public communications supporting or attacking federal candidates—all of which, under § 323(b), must be financed with hard money. *See* 540 U.S. at 166–71. The Court "concluded that because all of those activities 'confer substantial benefits on federal candidates, the funding of such activities creates a significant risk of actual and apparent corruption.'" *RNC*, 698 F. Supp. 2d at 161–62 (quoting *McConnell*, 540 U.S. at 168). That is fully true with regard to the independent FEA sought to be conducted by plaintiffs in this case.

The *RNC* court's rejection of a comparable as-applied claim is highly instructive on this score. There, instead of wishing to engage in independent FEA, the challengers sought to conduct FEA targeting state elections and having only an incidental effect on federal elections. The *RNC* court explained that the particular category of FEA implicated by the plaintiffs' as-applied claim (activity targeted at state elections) had "no legal relevance under *McConnell*." *Id.* at 162. The "Supreme Court made clear that whether § 323(b) can be constitutionally applied to a particular state or local party activity depends, not on whether the party's primary 'target' is

14

federal, but on whether the activity would provide a direct benefit to federal candidates." *Id.* Here, no less than in *RNC*, plaintiffs cannot "deny that their proposed activities"—independent FEA—"would provide such a benefit." *Id.*

Plaintiffs nevertheless see significance in the category of independent FEA based on the Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310. *Citizens United* invalidated a ban on independent expenditures by corporations and labor unions. The Court reasoned that such independent expenditures, as a matter of law, do not give rise to the appearance or reality of *quid pro quo* corruption (which, according to the Court, is the sole type of corruption that can justify a contribution or expenditure limit). *Id.* at 356–61; *see McCutcheon*, 134 S. Ct. at 1450 (plurality opinion). Plaintiffs here contend that, in light of *Citizens United*'s treatment of independent expenditures, a state party's independent spending on FEA likewise poses no risk of *quid pro quo* corruption or its appearance.

Plaintiffs misperceive the reach of *Citizens United*. While noting that the independent expenditures at issue there presented no risk of *quid pro quo* corruption, the *Citizens United* Court distinguished the soft-money contributions considered in *McConnell*: "The BCRA record establishes that certain donations to political parties, called 'soft money,' were made to gain access to elected officials. This case, however, is about independent expenditures, not soft money." *Citizens United*, 558 U.S. at 360–61 (citations omitted). By its own terms, then, "*Citizens United* did not disturb *McConnell*'s holding with respect to the constitutionality of BCRA's limits on contributions to political parties." *RNC*, 698 F. Supp. 2d at 153.

In supposing otherwise, plaintiffs misunderstand the way in which large soft-money contributions to political parties create a risk of *quid pro quo* corruption. As plaintiffs conceive of things, the potential *quid* for which a federal officeholder might be induced to grant a favor comes in the form of the spending of nonfederal funds by a political party. And if the spending

is independent of a candidate or campaign, plaintiffs posit, then it, like the independent expenditures considered in *Citizens United*, cannot give rise to a threat of *quid pro quo* corruption.

The flaw in that account lies in its conception of the potential *quid*. Under *McConnell*, the inducement occasioning the prospect of indebtedness on the part of a federal officeholder is not the *spending* of soft money by a political party. The inducement instead comes from the *contribution* of soft money to the party in the first place. *McConnell* explains why: "it is the close relationship between federal officeholders and the national parties, as well as the means by which parties have traded on that relationship, that have made all large soft-money contributions to national parties suspect." 540 U.S. at 154–55. "Given this close connection and alignment of interests, large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, *regardless of how those funds are ultimately used*" by the parties. *Id.* at 155 (emphasis added).

That understanding about "soft-money contributions to national parties" necessarily also extends to the state and local parties directly subject to § 323(b). After all, "BCRA's restrictions on national committee activity would rapidly become ineffective if state and local committees remained available as a conduit for soft-money donations." *Id.* at 161. Congress concluded that, if it barred national parties from raising soft-money contributions but left state parties free to do so, "political parties would react . . . by directing soft-money contributors to the state committees, and . . . federal candidates would be just as indebted to these contributors as they had been to those who had formerly contributed to the national parties." *Id.* at 165.

The *RNC* court thus described its understanding of *McConnell* as follows: "In relying in part on the inherently close relationship between parties and their officeholders and candidates," *McConnell* reasoned that "contributions to national [and state] parties have much the same

16

tendency as contributions to federal candidates to result in *quid pro quo* corruption or at least the appearance of *quid pro quo* corruption." 698 F. Supp. 2d at 159 (citing *McConnell*, 540 U.S. at 144). In that light, *Citizens United*'s holding about independent expenditures did not displace *McConnell*'s recognition of the inherent capacity of soft-money contributions to create a risk of *quid pro quo* corruption or its appearance, regardless of whether political parties ultimately spend those contributions independently of—or instead in coordination with—federal candidates and campaigns.

The potential for *quid pro quo* corruption stemming from soft-money contributions to political parties not only distinguishes them from spending *by* independent-expenditure organizations, but it also distinguishes them from contributions *to* independent-expenditure organizations. In *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), the D.C. Circuit invalidated a bar against contributions to a nonprofit organization that solely made independent expenditures and did not contribute to (or coordinate with) candidates and campaigns. *Cf. McCutcheon*, 134 S. Ct. at 1442 n.2 (describing "independent expenditure PACs"). The court reasoned that if, under *Citizens United*, independent expenditures by outside organizations carry no risk of *quid pro quo* corruption, contributions to outside organizations engaged solely in independent expenditures likewise pose no threat of *quid pro quo* corruption. *SpeechNow.org*, 599 F.3d at 694–95. But even if contributions to independent-expenditure organizations present no potential for *quid pro quo* corruption, contributions to political parties, for the reasons described in *McConnell*, have that potential. *See id.* at 695. As the D.C. Circuit has explained elsewhere, "*McConnell* affirmed BCRA's limits on contributions to political parties because of the close ties between candidates and parties," but "*McConnell* views political parties as different in kind than independent expenditure committees." *Emily's List v. FEC*, 581 F.3d 1, 13, 22 (D.C. Cir. 2008) (citation and quotation marks omitted).

None of this is to say that a political party necessarily is incapable of making independent expenditures. In a pre-*McConnell* decision, *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996), the Supreme Court struck down a law that operated to impose a cap on independent expenditures by a party. But the plurality opinion drew a distinction, with regard to the "danger of corruption" presented, between a "statute's limitations on *expenditures*" by political parties and a "statute's limitations on *contributions* to political parties." *Id.* at 617 (second emphasis added). The Court in that case considered the former type of statute, which the plurality invalidated in part because the circumstances addressed by the statute involved an inadequate "risk of corruption." *Id.* In *McConnell*, by contrast, the Court considered the latter type of statute—i.e., § 323(b)'s "straightforward contribution regulation." 540 U.S. at 161. The *McConnell* Court thus explained that *Colorado Republican* had "addressed an entirely different question—namely, whether Congress could permissibly limit a party's independent expenditures." *Id.* at 145–46 n.45. And even as to that separate question, *Colorado Republican* had been based "on an entirely different set of facts"—namely, "an evidentiary record frozen in 1990—well before the soft-money explosion of the 1990's." *Id.*

*McConnell*, in short, upheld § 323(b)'s contribution limit based on the threat of *quid pro quo* corruption posed by soft-money contributions to parties, regardless of how they ultimately spend the funds. And plaintiffs' effort to avoid *McConnell* based on the independent nature of their planned spending misconceives of the relevant *quid* as the spending by the party rather than the contribution to the party.

Plaintiffs also make a distinct argument to avoid *McConnell* that is focused on the nature of the *quo*. In particular, they contend that the plurality opinion in *McCutcheon* cabins the kind of actions by federal officeholders that can make out the requisite *quid pro quo* corruption.

According to plaintiffs, whereas *McConnell* generally assumed that the existence of influence or access would suffice, the *McCutcheon* plurality clarifies that something more—akin to the taking of an official action—is required.  *See* 134 S. Ct. at 1450–51.

Plaintiffs' argument about the *quo* gets them no further than their argument about the *quid*.  Whatever may be the implications of the *McCutcheon* plurality's opinion for the kind of officeholder actions evidencing the requisite degree of *quid pro quo* corruption, that opinion, as noted, specifically left intact "*McConnell*'s holding about 'soft money.'"  *Id.* at 1451 n.6.  The plurality denied the suggestion that it had "silently overruled" *McConnell*'s holding sustaining the validity of BCRA's restrictions on soft-money contributions.  *Id.*  In describing *McConnell*'s soft-money holding, the *McCutcheon* plurality referred specifically to BCRA's blanket ban on national parties' raising and using soft money.  If the soft-money ban for national parties remains untouched, so too must § 323(b)'s restriction on the use of soft money by state and local parties—the latter measure is less restrictive in allowing the use of nonfederal funds for at least some purposes (i.e., non-FEA).  And *McConnell*'s holding sustaining the facial validity of § 323(b), as we have explained, forecloses plaintiffs' as-applied challenge.

In addition, in describing what qualifies as *quid pro quo* corruption, the *McCutcheon* plurality relied entirely on—and quoted from—the understanding set out in *Citizens United*.  *See McCutcheon*, 134 S. Ct. at 1450–51.  And the *RNC* court explained in detail why the showing of *quid pro quo* corruption in *McConnell* meets the standard set forth in *Citizens United*.  *RNC*, 698 F. Supp. 2d at 158–60.  For our purposes, consequently, *McConnell*'s treatment of § 323(b) survives both *Citizens United* and *McCutcheon*.

Because *McConnell*'s approach in sustaining the facial validity of § 323(b) is incompatible with plaintiffs' as-applied challenge to the same provision, we reject that challenge.  As is the case with their facial challenge, moreover, plaintiffs give no reason to reach any

different conclusion with regard to their associated as-applied challenges to § 323(c) and BCRA's reporting requirements for FEA. We therefore reject those challenges as well.

### III. Conclusion

For the foregoing reasons, the court will deny the FEC's motion to dissolve, grant its motion for summary judgment, and deny plaintiffs' motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

SRI SRINIVASAN
United States Circuit Judge

CHRISTOPHER R. COOPER
United States District Judge

TANYA S. CHUTKAN
United States District Judge

Date: November 7, 2016